THE EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LIM-
ITED, A British corporation, Plaintiff Below, Appellant,
v. DAVID MADRIC and JAMES D. MADRIC, Defendants Be-
low, Appellees, and WESLEY HENDERSON, Intervening
Defendant, Appellee.

(*June* 19, 1962).

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and
CAREY, Judge, sitting.

*Herbert L. Cobin* and *Clement C. Wood* for appellant.

*Max S. Bell, Jr.* (of Richards, Layton and Finger) for
appellees David Madric and James D. Madric.

*Ernest S. Wilson, Jr.*, and *William T. Lynam, III*, for appellee Wesley Henderson.

Supreme Court of the State of Delaware, No. 63, 1961.

SOUTHERLAND, C. J.:

This is an action brought by Employers' Liability Assurance Corporation for a declaratory judgment determining its liability in respect of insurance coverage under a policy of automobile liability insurance on a Buick automobile owned by David Madric.

An accident occurred in January, 1959, while Madric's son was operating the car. The defendant Henderson suffered injuries and brought suit against Madric. He and Madric claimed that the risk was covered. The insurance company denied liability on the ground of a restrictive endorsement on the policy and filed this action. Henderson was permitted to intervene.

Madric asserted that the company was estopped by parol representation to deny that the policy covered the son. The court submitted the issue to the jury in the form of three questions. The jury answered them all in favor of Madric. The company appeals.

In the court below the company, at the trial and on motion after verdict, raised three questions:

1. It asserted that the court, in its rulings at the trial and in the charge to the jury erroneously held that the burden of proof was upon the insurer to disprove the estoppel.

2. It asserted that the coverage of the policy could not be expanded by parol representations of a countersigning agent in contradiction of the written policy.

3. It asserted that the evidence was insufficient to constitute an estoppel.

Contention (1) is renewed before us. As to that we entertain little doubt that the ruling was erroneous. The burden of proof of an estoppel should be upon him who asserts it, and the form of the action does not change the rule. See, *Preferred Accident Insurance Co. of New York v. Grasso,* 2 *Cir.,* 186 *F.* 2d 987, 23 *A. L. R.* 2d 1234. But in view of our ultimate holding, it is unnecessary to consider the matter further.

Contention (2) is not urged here. It is always a difficult question. See 3 *Richards on Insurance,* § 492.

Contention (3) is renewed here. It will now be examined.

The claimed estoppel rests upon parol representations made to the insured by the countersigning agent of the company after the issuance of the policy and before loss. The contention is that when Madric applied for insurance coverage on his son he was told by the agent, in effect, that he was already covered.

We review the testimony in some detail.

At the times here important David Madric was a truck driver employed by Angerstein & Son, at Elsmere. In April, 1958, he acquired from his brother a Chevrolet sedan. Mr. Walter Hawke, of the Hawke Company, an agent of Employers' Liability Assurance Corporation, was frequently at Angerstein's. Madric applied to him for insurance. Hawke took the application. It received "special treatment". It was not written in Wilmington by the general agent, and was sent to Philadelphia for approval.

There is no dispute that Madric represented that he would be the only operator of the car, and that he used it to drive to work and to church.

After some delay the policy was issued and returned to Hawke. Hawke left it with Mr. Willard Anseaume of Angerstein's for delivery to Madric.

The policy carried a typewritten endorsement consisting of two paragraphs. This was to be signed by the insured as well as the agent.

The first paragraph of the endorsement reads:

"It is agreed that such insurance as is afforded by the policy shall apply only while the automobile described in the policy is being operated by David Madric, and spouse".

This was a restriction of the coverage afforded by the standard family automobile policy. The regular premium was charged—$38.40.

The second paragraph of the endorsement does not concern us.

Mr. Anseaume delivered the policy to Madric and had Madric sign his acceptance of the provisions of the endorsement.

Mr. Anseaume's testimony about the signing and delivery of the policy is in substance as follows:

He explained to Madric that Hawke had left the policy with him for Madric's signature. He told Madric not to sign anything until he had read it. Madric picked it up and looked at it. Madric said he had read it and Anseaume then read the endorsement to Madric. He explained to Madric that "spouse" meant "wife". Madric then signed it.

Madric's version of this interview is somewhat confused. He first said there was no conversation at all about the policy; but on cross-examination he admitted Anseaume explained to him "about the wife", that is, that the policy was good for him and his wife only. He knew the boy "wasn't covered—because he explained that to me".

Madric's son became 16 years old on July 5. On an occasion late in June or early in July, while Hawke was at Angerstein's, Madric talked to him about insurance for the son.

Hawke's version of the conversation is as follows:

Madric asked whether his policy would cover him in the event his 16 year old boy would apply for a license and would drive the car. Hawke said it would not; he would have to submit it to the company for approval and reclassification, and if the company accepted the risk, there would be an additional premium.

Madric's version is that he asked Hawke about getting insurance for his boy and Hawke said he didn't remember whether or not the company wrote insurance for "youngsters", but he would "check".

Hawke said that he submitted the risk to the company, which rejected it.

Later in July Madric got a Buick car. He took the policy to Hawke and told him that he wanted to get his insurance transferred. Hawke took the policy, put the required endorsement on it and returned it to Madric. The endorsement is dated July 15 and recites a request of July 14.

About three weeks after the first interview about insurance for his boy (*i.e.*, about a week or so after the July 15 endorsement), Madric saw Hawke again. Upon Madric's version of this interview rests his contention that he was misled to his injury.

Hawke's version is as follows:

In July he saw Madric and told him that the company had declined to write the policy. Madric asked why so many youngsters could own and operate cars. Hawke did not attempt to explain that, but told Madric that if the youth were the principal operator of the car the premium would increase

even above what he had in mind for Madric when he had submitted Madric's application. The premium would then be $106. He may have given Madric the cost of the coverage if Madric's son was not the principal operator of the car; but he could not remember.

Madric's testimony about the interview is found in several places in the record. Some of the testimony must be quoted, because it is confused and difficult to understand.

On direct examination he said he saw Hawke in the yard and Hawke told him the insurance could be written but said it would cost approximately $106. Madric said he wanted it. Hawke said they could get it, but asked whether Madric would make the boy the principal driver of the car. Madric said no.

Hawke said:

"If you definitely want it, I can get it for you, but if anything would happen, which we hope it won't you will have the same responsibility with the insurance you got as you would if you were spending $106".

Madric replied:

"I said, 'Well, I don't have $106, and I will have to borrow it', and I said, 'if I had the same responsibility', I didn't see where it made any sense to borrow $106 * * *".

We pause to comment on this testimony.

Mr. Hawke's testimony is reasonably clear. He submitted an application to include the son as a male under 25, not an owner or principal operator. This would require a reclassification of the risk and an extra premium, as appears from his testimony and from a reading of the policy provisions. After the company refused to expand the coverage he told Madric that if the son were the principal operator the premium would be $106, higher than if he were not the principal operator. He may have thought that this risk some company might accept.

Madric's testimony is intelligible only if we infer that Hawke was reminding him of his responsibility under the statute (21 *Del. C.* § 6106) for his son's negligence, whether his son was covered or not. The defendants seek to read into this testimony as assurance from Hawke that Madric had the same "coverage", whether he paid the premium or not. In effect, they contend that Hawke said "coverage", which Madric erroneously repeated as "responsibility". On its face this seems absurd.

On cross-examination Madric testified as follows:

"Q   Now, Mr. Madric, when you talked with Mr. Hawke about this car, he said to you that, if you purchased the insurance for $106, you would have the same responsibility as before?

"A   Yes, sir, that is what he said.

"Q   That is what he said to you, if you purchase insurance for $106, you will have the same responsibility as before, is that right?

"A   With the insurance I had.

"Q   And, since you would have the same responsibility as you had before, you decided not to buy the additional insurance, is that right?

"A   So far as I know, right at the time, I didn't see where it would probably make sense to buy it, if I had to go through the same thing.

"Q   But that was the main part of the conversation, wasn't it?

"A   Well, the main part of the conversation, I wanted to get the boy so that he could drive the car, the insurance.

"Q   But these words that I have read to you were the main part of your conversation, wasn't it, that is the thing that decided you not to buy the additional insurance?

"A    That is right."

After again testifying to his inquiry about the insurance, and Hawke's statement that the company wrote it, he continued:

"Q.    And did you buy it?

"A    No. If we have the same coverage under what I had, it would cost me $106, and after he told me that I would have the same coverage and I didn't buy it.

"Q    He told you that you would have the same coverage under the new policy as you had under this one. Didn't you ask him, 'What am I paying $106 for?'

"A    Yes. I told you he explained it to me.

"Q    That you would have the same responsibility under the $106 policy that you had under this one?

"A    As long as the boy was under my name; that, if he was caught driving or drinking, this policy wouldn't be any good."

Madric here uses the word "coverage" for the first time; then returns himself to the word "responsibility".

He testified further:

"A    He (Hawke) told me that they wrote the insurance for the boy and told me how much it would cost.

"Q    And said that it would cost you $106 to get insurance for the boy?

"A    Approximately $106.

"Q    But that, even if you got it, you would be no better off?

"A    The same responsibility".

And again at the end of his cross-examination:

"Q   And when you went to Mr. Hawke and asked him about it, Mr. Hawke said that you could get it, but it would cost you $106?

"A   Yes, sir.

"Q   And that, even if you did get it, you would have the same responsibility as you had under the old one, is that right?

"A   That is what he said and that was what I was going on.

"Q   You didn't ask anybody else?

"A   No, I didn't ask anybody else. I take the man's word".

After both sides had rested, there was some discussion between court and counsel as to just what Madric had testified to. This is hardly surprising.

As a result the case was reopened and Madric was recalled. The following is his final version of his conversation with Hawke about insurance for his son:

"A   So I seen him and I asked him again. So he said yes, the company writes it, but it would cost you approximately a hundred and six dollars to get the insurance for the boy to drive.

"I said, 'Well, I want it.' So—but you got to make the boy the principal driver of the car. I said, 'No, we only got the one car for the family to use, and can hardly keep that'. I said, 'We just use it for the family, for church and groceries and things like that'. Then he told me wherein he could get the insurance but it wouldn't make sense to me to spend that kind of money on the insurance because I would have the same *responsibility*, the same *responsibility* with the insurance I had, either if I get the one for the hundred and six dollars. So I said, 'Well, if that's the case it don't make sense to me

to spend no hundred and six dollars because I don't have the hundred and six dollars and I have to borrow it. So I took him at his word, I went on and I signed the boy's license. Then on February, I believe, when the accident occurred, then I went back with the accident report, then they told me I had no *coverage*". (Emphasis supplied.)

Note that Madric himself distinguishes between these two words.

Out of these vague statements defendants strive to spell out an estoppel. They contend that Hawke, an experienced insurance agent, told Madric that Madric already had the coverage for his son that he wanted, and that Madric, in ignorance of the facts, relied on this assurance and arranged for his son to get a driver's license.

To put it bluntly, this contention makes no sense. Let us examine the background of the alleged estoppel. Madric when he acquired a car, knew that he should have insurance. He applied for it, and got it with a special restriction. So far as concerns his family, only he and his wife were protected. He admits that he understood this. Moreover, when he thought of allowing his son to drive, he asked for "more insurance" for the son. He knew that he was not covered, and Hawke knew that he was not covered, for he submitted the application to the company (or "checked" it, as Madric says).

The conversation when Hawke reported to Madric about the matter is in dispute. But Madric's contention, that Hawke told him he was already covered, cannot be correct. If Hawke had mistakenly believed that, why did he not tell Madric when Madric first inquired about the matter?

It is suggested that at the second interview Hawke had forgotten about the limited coverage and supposed that Madric had the ordinary family automobile policy. The fact is that not only had Hawke written the original policy, but he

had just reviewed it. That he, as an experienced insurance man, told Madric that the policy restriction did not apply is beyond belief.

The defendants' case is therefore without any competent evidence to support it, unless we were to accept the "scintilla of evidence" rule as the law of this State. This we decline to do. There was accordingly nothing for the jury to pass upon.

But this is not all. The defendants have failed to bring their case within the elementary rules governing estoppels *in pais*.

First, the quality of the proof must be "clear and convincing", and here it is neither. An estoppel may not rest upon an inference that is merely one of several possible inferences. See *Rudnick v. Schoenberg*, 2 *W. W. Harr.* 339, 32 *Del.* 399, 122 *A.* 902. This is not a question of instructions to the jury; it is whether the defendants have made out a case— a question squarely raised below and passed on by the court. In effect, though not in form, defendants are attempting to reform the insurance contract. If a suit for that purpose were brought in equity, it is inconceivable that a Chancellor would grant relief. True, this is a jury case, but is nevertheless a case of equitable estoppel.

Second, estoppel is a rule that in the interest of justice suppresses the truth. One who asserts an estoppel must show that he was ignorant of the truth; "and he must have been permissibly ignorant thereof". *Bigelow on Estoppel* (6th Ed.), p. 681. Madric knew, and admitted that he knew, that his policy covered only him and his wife; he knew that he needed something more to include his son, because he asked for it. How could he have reasonably believed that he had been covered all the time?

Much is said about his lack of "sophistication". Apparently the word is not used in its ordinary sense of "worldly

wisdom". Counsel must mean that Madric was of limited intellectual ability. But he was not illiterate, and lack of ordinary intelligence is not shown. He knew, for instance, that when he got the Buick car his insurance must be changed.

This is not a case, as counsel suggests, of the interpretation of the involved "fine print" clauses of the insurance contract. What is involved is an attempted contradiction of a clear and simple endorsement that any person of ordinary intelligence can understand, and which Madric did understand.

The best case that can be made for Madric is that (as he once said in his testimony) he was confused about the matter. But to say that he was confused is far from saying that he was misled.

We think that the company's motion for a directed verdict should have been granted.

The judgment below is reversed and the court below is instructed to enter a judgment for the plaintiff in conformity with this opinion.