HANK  THORP,  INC.,  Plaintiff,

v.

MINILITE,  INCORPORATED,
Defendant,

and

Tech  Del  Limited,  Defendant/Intervenor.

Civ.  A.  No.  77–149.

United  States  District  Court,
D.  Delaware.

July  10,  1979.

Rudolf E. Hutz and John D. Fairchild, of Connolly, Bove and Lodge, Wilmington, Del., for plaintiff.

John G. Abramo, of Abramo & Abramo, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

The plaintiff, Hank Thorp, Inc., filed a complaint on April 18, 1977, alleging trademark infringement and unfair competition by the defendant, Minilite, Inc. Minilite, Inc. filed a counterclaim requesting that plaintiff's trademark registration be cancelled. On June 2, 1977, Tech Del Limited ("Tech Del") moved to intervene as a defendant, and also filed a counterclaim, requesting the plaintiff's trademark be cancelled or assigned to Tech Del. The defendants also sought damages from the plaintiff.[1] The issues raised were tried to the Court for five days. This opinion constitutes the Court's findings of fact and conclusions of law.

## I. THE FACTS.

### A. *The Agreement.*

In 1963, Derek Power formed several British corporations, including the Onics Holding Company, and its subsidiary, Tech Del. (Power, C–149). Since that time, Power has been the managing director and Chairman of the Board of Tech Del. (Power, D–160). In 1963, Tech Del began to manufacture magnesium racing wheels in Great Britain under the tradename "MINILITE". Those wheels were first used for racing in Europe in February of 1964, (Power, C–158), and became quite well-known among European racing drivers and race enthusiasts. Since 1964, Tech Del has sponsored racing cars at various European races, and carried on a vigorous advertising campaign. (DX–88–110; Power, C–160–61). MINILITE magnesium racing wheels quickly developed and still enjoy a reputation for quality and performance. (Robertson, A–47–48, 120; Sharp, B–14, 31).

In early 1964, Edward Astri of Baltimore, Maryland, (Astri, D–9; Power, D–36) became the exclusive United States distributor of MINILITE wheels. (DX–40; Astri, D–7). That distributorship arrangement was pursuant to an oral agreement. (Astri, D–8, D–25).

Astri received his first shipment of wheels from Tech Del in April of 1964, and continued to receive wheels until February of 1965. (DX–42). The shipment came in cardboard drums bearing the MINILITE mark. Some 400 wheels from Tech Del were sold by Astri under the tradename "ASTRIMINILITE". (DX–38; Power, D–42). In his general promotional attempts, Astri mailed catalogues which included advertisements of ASTRIMINILITE wheels to 42 states and he advertised the wheels in racing magazines which had national distribution. (Astri, D–11, D–20–21). Astri sold ASTRIMINILITE wheels in at least twelve states, including California, the District of Columbia, Hawaii, Maryland, New Jersey and Ohio. (Astri, D–21). In the spring of 1965, Astri had financial problems and was unable to pay for wheels he had ordered from Tech Del. (Power, D–45). As a result, Astri's relationship with Tech Del was terminated in May or June of 1965.

Following the dissolution of the Astri relationship, Tech Del had no one to distribute MINILITE wheels in the United States. In August of 1965, it mailed out "Dealer Bulletins" (DX–44) to prospective MINILITE distributors. Tech Del also placed a MINILITE advertisement in the January, 1966 issue of *Car and Driver* magazine. (DX–4; Power, D–47). As a result of these efforts, Tech Del received more than 150

---

1. The parties have agreed that if the plaintiff is liable to the defendants for damages, the amount of such damages shall be determined at a later time.

inquiries from persons in the United States in December of 1965 and January of 1966. (Power, D–48). From the spring of 1965 until early 1966, Tech Del did not export any wheels to the United States, although Astri was selling his MINILITE inventory during that time. (Power, D–57–58).

One of the people who had inquired about distributing MINILITE wheels in the United States was Hank Thorp. In January of 1966, via a transatlantic phone call, Thorp agreed to place an initial order for 200 MINILITE wheels and Power agreed to make Thorp's company Tech Del's exclusive United States distributor. (Thorp, A–172–173; Power, D–50, D–186).

Thorp has been the owner of a foreign auto parts business in Edison, New Jersey, since 1958. (Thorp, A–145). In 1962, it was incorporated and named "Hank Thorp, Inc." (Thorp, A–155). Thorp has been the President of Hank Thorp, Inc. at all relevant times. From 1962 to 1965, Thorp, together with Jack Stewart, had manufactured and marketed aluminum alloy racing wheels with steel insert casts under the tradename "DEMAR". (Thorp, A–156, 164, B–156). However, in the fall of 1965, the old DEMAR wheels became obsolete as a result of certain racing rule changes. (Thorp, A–165). Rather than keep producing DEMAR wheels under new specifications, Thorp decided to market Tech Del's MINILITE wheels.

Thorp's first order of MINILITE wheels was shipped to the United States on March 14, 1966. (DX–46). In the spring of 1966, Power visited the United States and met with Thorp. (Thorp, A–178; Power, D–52). During meetings on that visit, Thorp raised the subject of putting the exclusive distributorship contract into writing. (Thorp, A–183). While both sides agreed that Thorp would be the exclusive United States distributor of MINILITE wheels, Tech Del refused to enter a written contract. Power told Thorp that "as long as two people agreed to conduct a business together and they got along, a contract wasn't neces-

sary" and that "if it ever got to the point that they disagreed, contracts probably weren't any better than the paper they were written on." (Thorp, A–184, C–43; Power, D–55).[2] Power and Thorp also discussed the name under which the wheels would be marketed in the United States. Thorp wanted to use the tradename "THORP MINILITE". Power preferred just MINILITE. Power let Thorp have the final decision and that decision was MINILITE. (Thorp, A–181; Power, D–53, D–192).

In July of 1966, Tech Del placed a MINILITE advertisement in *Road and Track* magazine, (PX–6), with instructions for people interested in MINILITE wheels to write to Hank Thorp, Inc. for details. (Thorp, A–182, 184; Power, D–188). In addition, for the next two or three years, Tech Del supplied Thorp with a number of packets of software promotional materials. (DX–16–20). (Thorp, C–124–5; Power, D–58–60). Other than the delivery of this promotional software to Thorp, Thorp was responsible for all promotion and marketing of MINILITE wheels in the United States. (Thorp, A–182; Power, D–56).

In January of 1969, Thorp went to London for an auto show, and met with Power there. At that show, Thorp introduced Power to two American race car drivers: Mark Donohue and Roger Penske. (Thorp, B–60; Power, D–103). The four men discussed the possible use of MINILITE magnesium wheels in the 1969 TransAm races in the United States, and Power was encouraged to manufacture a new size racing wheel for the spring of 1969. During that meeting, Penske inquired of Power as to whether his racing team might be able to buy MINILITE wheels directly from Tech Del. Power told Penske that Thorp was the exclusive United States distributor of MINILITE wheels, and that Penske would have to get his MINILITE wheels from Thorp. (Thorp, B–61; Power, D–104–105).

B. *The Sport Wheel.*

As noted above, when Tech Del and Hank Thorp, Inc. reached their exclusive distribu-

---

2. At that time, none of Tech Del's distributorship agreements were in writing. (Power, D–56). In 1971, that policy was changed. (Power, D–167).

torship agreement, Tech Del was manufacturing magnesium racing wheels under the name MINILITE. Magnesium racing wheels are not mass-produced, and thus are quite expensive. At some time after January of 1966, Tech Del began considering the manufacture of high pressure magnesium sport wheels for street use. (Power, D–87–89). It was thought that these sport wheels could be mass-produced and would sell for approximately half the price of the MINILITE racing wheels. Power first mentioned the sport wheel concept to Thorp in 1967. (Thorp, C–32; Power, D–84).

In the spring of 1968, while Power was visiting the United States, he and Thorp discussed Tech Del's plans to begin marketing high pressure magnesium sport wheels for street use. Because of their lower price, the MINILITE sport wheels were expected to have a much larger market than the magnesium racing wheels. Power expressed some doubts as to whether Thorp had either the organization or the experience to market the sport wheels. He was particularly concerned with Thorp's ability to market the wheels on the West Coast. (Power, D–91). Power testified concerning the 1968 conversation (D–90):

. . . I made that point that Hank Thorp himself neither had the experience nor the organization to handle this. That was a hurdle, but it wasn't a problem that we couldn't solve.

I suggested that it might be a prudent thing for us to set up a business where I could introduce the other product lines into America and maybe we would handle the high pressure ones, the mass production wheel, through just that organization, maybe in conjunction with Hank. We just postulated alternative ways of marketing production.

Hank convinced me that he could expand and that he didn't have the experience but he could get access to it, and he didn't have the finance but he could get access to that and he would certainly like to have a try. And when I went back to England, I was quite convinced that it would be quite worth giving it a try.

Thus, it was expected that when the sport wheel arrived, Hank Thorp, Inc. would market it in the United States.

The die for the high pressure magnesium sport wheel was ready in 1969. (Power, D–84). However, when the die did not work properly, Tech Del changed its plans and decided to manufacture high pressure aluminum sport wheels for street use. (Power, D–85–86). Several thousand high pressure aluminum sport wheels were produced in 1971 and 1972. (Power, D–86, E–118). When the high pressure sport wheels also had production problems, Tech Del switched to low pressure aluminum sport wheels for street use in 1973. (Power, D–86–87).

In 1973, the die for the low pressure aluminum sport wheel was perfected, and Tech Del was ready to begin production. (Power, D–118). Tech Del proposed to make the first two dies for the American market, and let Thorp specify which two sizes to produce. (Power, D–118). At first, Tech Del wanted Thorp to assume the risk of capitalizing those two dies. Thorp refused, but he did agree to amortize the cost of those dies by undertaking to sell 16,000 sport wheels over a two-year period. (Power, D–119). Thereafter, however, Tech Del attempted to increase its price 22%, (Power, D–157–158), and Thorp refused to commit to 16,000 wheels. (DX–35). In the two-year period, Hank Thorp, Inc. purchased 6,000 sport wheels from Tech Del. (Power, D–123–124). Those sport wheels had the MINILITE name machined on to them in England.

C. *Thorp's Promotional Activities.*

Hank Thorp, Inc. advertised MINILITE wheels weekly in *Competition Press* and monthly in *Sports Car* magazine from May of 1966 until 1977. (Thorp, B–45). In 1967, Thorp began to promote MINILITE wheels on his own racing car. (Thorp, B–50–51). Thorp estimated that in 1967, Hank Thorp, Inc. spent $10,000 on racing promotional efforts, and in 1968, it spent $30,000 on those efforts. (Thorp, B–52, 56). From 1969 on, all the TransAm race winners were using MINILITE wheels, (Thorp, B–77),

and Thorp ran congratulatory ads to those winners. (PX–79 to 82). There is testimony that Thorp promoted the MINILITE racing wheels heavily at TransAm races and International Race of Champions ("IROC") races from 1968 on. (Alderman, A–12–13; Sharp, A–14–16).

Over time, Thorp devoted more and more of his energy to selling MINILITE wheels. By 1970, Hank Thorp, Inc. had sold off all but one or two other product lines and spent a substantial portion of his time selling MINILITE wheels. (Thorp, B–105, C–11; Sharp, B–41).[3] As one witness testified, "If you think MINILITE, you think of Hank Thorp." (Robertson, A–40). Another witness said: "Hank was known as Mr. MINILITE in this country." (Sharp, B–30).

In 1970, Thorp contacted Professionals in Motion, an advertising group. (Thorp, B–81). In early 1971, when Thorp was given assurances that the long-awaited high pressure aluminum sport wheel would be available, he retained Professionals in Motion at $1,000/month. (Thorp, B–84, C–136; PX–91; DX–6). Professionals in Motion developed new boxes designed for the MINILITE sport wheels, (PX–92, 116), and stylized MINILITE decals. (PX–95 to 98). In 1972 or 1973, Hank Thorp, Inc. started advertising under the name of MINILITE in such national magazines as *Car and Driver* and *Road and Track*. (Thorp, B–97; PX–93, 94). All in all, over the eleven year period from 1966 to 1977, Hank Thorp, Inc. spent a total of $130,000 in MINILITE media advertising. (Thorp, B–47).

D. *The Trademark Registration And The Tech Del Reaction.*

When Tech Del and Hank Thorp, Inc. reached their agreement in 1966, Power and Thorp did not discuss the United States trademark rights to the MINILITE name. It was not until a Power visit to the United States in the spring of 1968, that this subject was expressly addressed. While both Power and Thorp remember the discussion, their recollections differ to some degree.

Both do recall that Power brought up the subject of the MINILITE mark, that he expressed interest in registering it in the United States, and that Thorp agreed to look into what it would cost to accomplish this. (Thorp, B–54, C–40; Power, D–73–74, 201, 202). From the spring of 1968 until the commencement of this litigation, Power and Thorp did not discuss the United States registration of the MINILITE trademark again. (Power, E–38).

Thorp testified that in late 1968 he told Mark Donohue, the race driver, about the MINILITE high pressure magnesium sport wheel which was supposed to be ready for production in early 1969. (Thorp, B–64–65). Thorp testified (B–65):

[Donohue] suggested at that point that the [MINILITE] name was going to become a very valuable marketing asset, particularly when it was. applied to the mass market and street wheels, and perhaps I ought to consider just having a chat with his dad. Mr. Donohue, Sr. had done some patent work for me in the very early 60's. And I believe I did take the time before I went to London to call Mr. Donohue in his capacity in the New York law firm to just check into the cost of what the registration of a trademark would be.

In January of 1969, Thorp went to London, where he introduced Mr. Power to Mark Donohue and Roger Penske. The conversation between Power and Penske at that time has been noted above. In London, Thorp did not discuss the possibility of registering the MINILITE mark in the United States with Power. (Thorp, C–85). When Thorp returned from London, he called Mr. Donohue, Sr. and authorized him to undertake a patent office search to determine the availability, for trademark purposes, of the MINILITE name. (Thorp, B–65, C–62). After the search, Donohue expressed the opinion that MINILITE was available for racing wheels, and Thorp authorized the registration application on February 12, 1969. (PX–3(a); PX–4(9)).

---

3. Hank Thorp, Inc. continued to transact substantial non-MINILITE business, however. In 1975 and 1976, for example, purchases from

Tech Del constituted about half of all Hank Thorp, Inc. purchases. (D–152–3; DX–161).

On March 12, 1969, Donohue wrote to Thorp, asking for the "date of first use of the MINILITE trademark on wheels in the United States". (PX–3(4); PX–4(11)). Thorp responded that the "first usage of the name 'MINILITE' as a wheel trade name was January 1, 1965, and . . . was . . . by Mr. Edward Astri. . .", that Astri's distributorship had been cancelled effective June 30, 1965, and that Thorp became the exclusive United States distributor effective January 1, 1966. (PX–3(5); PX–4(12)). Thorp responded to all of Donohue's questions without checking the facts concerning Astri's use with Mr. Power. (Thorp, C–76–78, 81–82).

The trademark application was in the name of Hank Thorp, Inc., and was executed by Thorp. It represents that the "trademark was first used on the goods in January, 1965, was first used in interstate commerce in January 1965 and is now in use in such commerce." (PX–3(11); PX–4(27a), (30)). It further states that Thorp "believes that . . . [Hank Thorp, Inc.] is the owner of the mark sought to be registered" and that to the best of . . . [Thorp's] knowledge and belief no other person, firm, corporation or association has the right to use the mark" in commerce in the United States. (DX–1).

On March 16, 1970, the Patent Office notified Donohue that the MINILITE trademark "appears to be entitled to registration", and that it would be published for opposition in the April 7, 1970 Official Gazette. (PX–4(43)). On June 23, 1970, the MINILITE mark was registered to Hank Thorp, Inc., as No. 893,174. (PX–1; PX–4(53)). The trademark registration process was not mentioned to Power in 1969 or 1970. (Thorp, C–86–87).

Even before the MINILITE mark was registered, Thorp had written to the Bureau of Customs of the United States Department of the Treasury to inquire as to how he might arrange for a customs import ban on goods bearing the mark and imported without Hank Thorp, Inc.'s authorization. (Thorp, B–70–75). He filed an application with the Bureau of Customs on October 12, 1970 and, on November 6, 1970, the Bureau recorded the MINILITE mark in the name of Hank Thorp, Inc., for purposes of an import ban. (PX–3(47); PX–4(90); PX–2; PX–4(108)).

As noted above, from January of 1969 until the United States trademark registration process and customs ban were completed, Thorp never mentioned his trademark registration activities to Power or anyone else at Tech Del. On November 23, 1970, Thorp wrote to Tech Del on Hank Thorp, Inc. stationery which bore the notation "MINILITE ®". (DX–62). In the last paragraph of that letter, Thorp stated:

Thanks for the information about the copy of the MINILITE being sold in Germany. I am sure that our registration of the tradename "MINILITE" and the accompanying registration of its appearance with both the U. S. Patent Office and the U. S. Bureau of Customs would undoubtedly prevent import of this wheel into this country if it is attempted.

On December 2, 1970, Thorp wrote to Tech Del, and mentioned an Italian copy of the MINILITE wheel being imported into the United States. (DX–63). He stated:

Now that we have completed registration of the MINILITE Trade Mark with the U. S. Bureau of Customs, I may take the matter up with the customs office to see if the similarity in appearance may possibly allow us to prevent entry of this wheel into this country.

Again, in a letter to Tech Del on December 7, 1970, Thorp mentioned "our MINILITE registration with the U. S. Bureau of Customs". (DX–64).

After Thorp had mentioned the United States trademark registration in his letters to Tech Del in late 1970, the Tech Del Board of Directors decided to seek information and advice from its Chartered Patent Agents. (PX–5(1)). On May 13, 1971, the Patent Agents informed Tech Del that the MINILITE mark had been registered on June 23, 1970, by Hank Thorp, Inc., and advised that the best course of action would be a friendly letter to Hank Thorp, Inc. requesting assignment of the trademark to

Tech Del. The agents also advised that if there could be no friendly disposition of the matter, Tech Del could apply to cancel the MINILITE mark. (PX–5(5–9)).

Power visited the United States in May of 1971. Neither Thorp nor Power raised the subject of the trademark registration during this visit. Tech Del had a substantial capital investment at that time in dies for the MINILITE sport wheel but was experiencing grave manufacturing problems and had not been able to get the wheel on the market. This situation and problems with other product lines had left Tech Del with financial problems. Thorp was irate about the delay in getting the sport wheels. Power felt sure that a confrontation about the trademark would lead to litigation with attendant expense and the possibility that Tech Del might not be able to market its wheels in the United States for a substantial period of time. He decided to concentrate on getting the new sport wheels on the market and to wait for a better time to address the trademark problem. (Power, E–22–29, 122–24; D–126–27).

By early 1974 Tech Del's financial problems had eased and business prospects began to look up. Power testified that he began looking for a "friendly moment . . for a friendly discussion." The anticipated prosperity did not arrive, however, and there was no friendly discussion. (Power, E–33–34).

The only evidence of any communication between Tech Del and Hank Thorp, Inc. about the United States trademark is the testimony of Mr. Thorp concerning a telex he received from Jack Tross of Tech Del sometime in 1971. Thorp testified (B–111–12):

. . . to the best of my memory it asked if there was any way that I would be willing to assign the ownership of the trademark registration in exchange for a long-term contract for exclusive importation . . . And I just merely said that I had been advised that that assignment might weaken the rights of Hank Thorp, Inc. to the name in the United States. That was the entirety of the situation: one request with no explanation whatsoever, no answer that I gave them, and the subject was never raised again.

On August 7, 1975, Hank Thorp, Inc. filed an affidavit of continuous use of the MINILITE mark for five years with the Patent and Trademark Office, thus achieving incontestable status. (PX–3(68)).

### E. *The Parting of Company.*

In 1973, Tech Del had its best financial year due to increased sales of the magnesium racing wheels and the introduction of the low pressure aluminum sport wheel. (Power, D–95). However, 1974 turned out to be a disaster for Tech Del. (Power, D–96). Power attributed the 1974 downturn in part to the world fuel crisis, but mainly to Thorp's poor marketing. (Power, E–51–52).

In February of 1975, Power visited Thorp. They discussed mainly some 600 defective sport wheels and reached an agreement on making corrections. (Thorp, B–117–121). The meeting was far from friendly. Power and Thorp had serious marketing disagreements. Power testified (E–50):

[Thorp] said to me that he would not consider any modifications whatsoever in his marketing structure and, if I wanted to do anything about it, it's just a question of dollars and cents. And I said to him "I really don't think we've come to that point yet."

The trademark registration was not discussed. (Power, E–50).

In January of 1976, Power sent Thorp a telex referring to Thorp's apparent inflexible attitude and the poor business prospects for 1976. Power listed four points, and said if they were not acceptable to Thorp, prospects for 1976 would remain poor. Finally, Power suggested that Thorp consider ceasing the marketing of MINILITE wheels. (DX–34). On the same day, Thorp responded by telex that if Power was serious about Hank Thorp, Inc. ceasing marketing MINILITE products, Power should come to the United States to discuss the financial

arrangements for the transfer of its distributorship rights to someone else. (DX–35). However, that suggestion was not followed through.

In the fall of 1976, Power visited five cities on the East Coast of the United States and stopped to see at least three automobile accessory dealers in each city. (Power, D–93). Of all the dealers visited, only two had heard of MINILITE wheels, and only one actually distributed them. (Power, D–94). By late 1976, Tech Del's directors were convinced that the MINILITE marketing system utilized by Hank Thorp, Inc. in the United States was unsatisfactory. While Power thought that the American market for wheels was ten times as large as the European market, Hank Thorp, Inc. never had as much as 20% of the total world MINILITE market. (Power, D–100–101).

In 1976, Tech Del decided to market a new sport wheel in the United States. The wheel decided upon was identical to the MINILITE lower pressure aluminum sport wheel in design, although there were cosmetic differences. (Robertson, A–121–22; Power, E–65). The new wheels would be polished rather than painted and the MINILITE name would be ground off. They were to be marketed under the name "MAXILITE". (Robertson, A–44–49; Power, E–65–67).

On January 19, 1977, Power wrote to Thorp, telling him that Tech Del intended:

> to introduce new services for the importation and distribution of our proprietary MINILITE wheels, both magnesium and aluminum, in the U.S.A. which are additional to and not associated with yourself or your Company.

(PX–33). In that letter, Power also indicated that Tech Del was willing to continue to supply Thorp with MINILITE wheels, but only upon receipt of a sight draft.

In early 1977, Onics Holdings, Inc. and a wholly owned subsidiary, Minilite, Inc., were incorporated in Delaware. (Power, E–68–69). Minilite, Inc., was given a non-exclusive distributorship of Tech Del's wheels in the United States. (Power, E–76). In April of 1977, Minilite, Inc. began advertising the MAXILITE polished aluminum sport wheel in magazines of national circulation. (PX–14–44, 69, 71–73, 76, 77). During the same month, Onics Holdings, Inc. applied to the Commissioner of Patents and Trademarks to register the MAXILITE trademark. (Power, E–90, 91). Registration was denied because of the similarity of MAXILITE and MINILITE. (PX–111).

On April 7, 1977, Tech Del instituted proceedings before the Patent and Trademark Office seeking to cancel Hank Thorp, Inc.'s MINILITE trademark, and to register the MINILITE mark in its own name. (Power, E–101). Eleven days later, Hank Thorp, Inc. filed this trademark infringement action against Minilite, Inc.

Minilite, Inc. did not do well financially. It used up its 1977 annual advertising budget in four months. (Robertson, A–74; Power, E–88). Although it did sell approximately 2,000 wheels purchased from Tech Del after January 1, 1977, it was soon forced into bankruptcy.

## II. INCONTESTABILITY.

Section 15 of the Lanham Act, 15 U.S.C. § 1065, provides, in part:

> except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable.

Section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b), provides in part:

> If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's ex-

clusive right to use the registered mark in commerce or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established . . .

The first of the seven listed "defenses or defects" is fraud. Specifically, Section 33(b)(1) provides that even after a mark has achieved incontestable status the registrant's right to exclusive use may be challenged if "the registration or the incontestable right to use the mark was obtained fraudulently."

Tech Del contends that Hank Thorp, Inc.'s trademark registration was fraudulent in several respects. Its principal contention is that Hank Thorp, Inc. never owned the MINILITE mark and that, while Thorp was aware of that fact, the affidavit submitted in connection with the application to register the trademark represented that Thorp believed Hank Thorp, Inc. to be the owner of that mark. In response, Hank Thorp, Inc. argues that this affidavit was truthful and that, in any event, Tech Del is estopped to claim an interest in the United States trademark rights.

While a number of other issues have been tendered by the parties, under my view of the facts it is necessary to address only the fraud issue and the estoppel issue.

### III. THE FRAUD ISSUE.

There is no dispute between the parties concerning the legal principles relevant to a determination of the ownership of a trademark as between a manufacturer and his exclusive distributor. Professor McCarthy summarizes those principles and applies them in the context of a foreign manufacturer and his exclusive United States distributor in the following paragraph:

It is well-settled that the question of ownership of a trademark as between the manufacturer of a product to which the mark is applied and the exclusive distributor of that product is a matter of agreement between them. In the absence of

any such agreement, there is a legal presumption that the manufacturer is the owner of the mark. The general rule is also applied as between a foreign manufacturer and the exclusive United States distributor. That is, ownership of a trademark in the United States as between a foreign manufacturer and an exclusive United States distributor is a matter of agreement between them. In the absence of express or implied acknowledgement or transfer by the foreign manufacturer of rights in the United States, all rights to the trademark in the United States, are presumed to be in the foreign manufacturer. An exclusive U.S. distributor does not acquire ownership of a mark of a foreign manufacturer any more than a wholesaler can acquire ownership of a mark of an American manufacturer merely through the sale and distribution of goods bearing the manufacturer's trademark.

McCarthy, *Trademarks and Unfair Competition,* § 16.15 (1973). *See also Audioson Vertriebs-GmbH v. Kirksalter Audiosonics, Inc.,* 196 U.S.P.Q. 453 (TTAB 1977); *Jean D'Albert v. Henkel-Khasana G.m.b.H.,* 185 U.S.P.Q. 317 (TTAB 1975); *Bakker v. Steel Nurse of America, Inc.,* 176 U.S.P.Q. 447 (TTAB 1972); *Compania Insular Tabacalera v. Camacho Cigars, Inc.,* 167 U.S.P.Q. 299 (TTAB 1970), *aff'd,* 171 U.S.P.Q. 673 (D.C. 1971).

While Hank Thorp testified that an understanding between the parties was reached in 1966 which involved an assignment of the United States rights to the MINILITE mark to Hank Thorp, Inc., he was unable to point to any document which embodies or in any way evidences such an agreement. Similarly, he was unable to identify any meeting or telephone conversation at or during which a commitment by Tech Del to assign was made or even discussed. Indeed, there is no evidence in the record of any conduct on the part of Tech Del between 1966 and 1970 which constituted, or could reasonably be interpreted as constituting, an assignment of trademark rights to Hank Thorp, Inc. While I do not

doubt that Thorp believed his company should, in fairness, have title to the United States rights, I am confident that throughout the pendency of the registration proceeding in 1969 and 1970, he realized that those rights belonged to Tech Del. A brief review of the events of the 1966 to 1970 period will explain the reasons for this conclusion.

The original deal between Tech Del and Hank Thorp, Inc. was struck during a transatlantic phone call in January of 1966. The two firms had never done business before and their principals had never met. The terms of the deal were not complex. Hank Thorp, Inc. agreed to order 200 MINILITE wheels and Tech Del agreed to make it the exclusive United States distributor. The most noteworthy thing about this agreement for present purposes is the absence of any agreement as to the term of the exclusive distributorship. The permanence of the claimed trademark assignment contrasts rather sharply with the lack of permanence of the underlying business arrangement.

It is apparent that, early on, Thorp had misgivings about the lack of long term security in his situation. In the spring of 1966, during Power's first trip to the United States after the formation of the relationship, Thorp raised the subject of the agreement and asked for a written contract. Thorp's account of the discussion was as follows:

> Well, I was at that time clearly under the impression that Mr. Astri's arrangement, including the 90-day cancellation clause, had been in writing and I asked whether I couldn't have a contract in writing to confirm that I was the sole agent for Tech Del in the United States. And Mr. Power resisted reducing this to writing. He told me that as long as two people agreed to conduct a business together and they got along, a contract wasn't necessary. If it ever got to the point that they disagreed, contracts probably weren't any better than the paper they were written on. He said they just preferred not to do business by having

contracts in writing and that was not the last time that that subject came up between us. But I really didn't know what to do. The man said he doesn't want to, you know, give me a written contract. I just had to go along with him. He said as long as two people got along and they were in business that was mutually profitable, there was no need for a contract. I said I suppose, that may be true. He obviously doesn't want to reduce it to writing so why press the issue?

The agreement between the firms thereafter remained an oral one which was assured to last only as long as "they got along." It likewise remained one which was hardly consistent with an assignment of the manufacturer's trademark rights in what was agreed by all to be the largest market for its product.

Two years later, in the spring of 1968, Power and Thorp expressly addressed the subject of trademark rights. Power was again visiting the United States. He first informed Thorp that the trademark had been registered by Tech Del in Great Britain in 1967 and the two of them then talked about the possibility of registration in the United States. While the accounts of the conversation conflict to some degree, I accept Thorp's version. He testified on both direct and cross examination that Power inquired as to the registration of the trademark in the United States and that he, Thorp, offered to check into the cost for him. It is clear from Thorp's account that Power was interested in registering the mark in the United States on behalf of Tech Del. Thorp did not protest Power's plan and, indeed, agreed to help facilitate it. Yet Thorp never did report back to Tech Del on costs. A number of contemporaneous and subsequent events offer an explanation for this default.

During the same Power visit in the spring of 1968, Power told Thorp of Tech Del's plans to begin marketing MINILITE high pressure magnesium sport wheels for street use. Power told Thorp at that time that there were some doubts at Tech Del about whether Hank Thorp, Inc. had either

the organization or the experience to be able to market the sport wheels in the United States. There was at least a suggestion that Hank Thorp, Inc. might not be the exclusive distributor of MINILITE sport wheels in the United States. While Thorp convinced Power that Hank Thorp, Inc. would be the exclusive United States sport wheel distributor, that conversation gave Thorp good reason to want to ensure that he would remain the exclusive distributor of all MINILITE products in the United States.

In January of 1969, Thorp went to London, where he had a conversation with Power, Donohue and Roger Penske. Penske told Power that he wanted to use MINILITE wheels at the 1969 TransAm races, and also that he wanted to deal directly with Tech Del, rather than through Hank Thorp, Inc. When Thorp was confronted with the notion that his exclusive distributorship might be in jeopardy, he "had a rather uneasy feeling in the pit of  .  .  . [his] stomach." While Power stood by Thorp in this instance, I believe it forcefully brought home to Thorp the precarious nature of his position.

As soon as he returned from London, Thorp called Mr. Donohue, Sr. and set the MINILITE trademark registration application in motion. He did not tell Power or anyone else at Tech Del about the filing of that application. Moreover, despite the fact that he had only casual hearsay information about the Astri-Tech Del relationship, Thorp used the commencement of Astri marketing as a date of first use without checking the date of the first sale. After the filing of the application business continued as usual. The registration was published in April of 1970 and ultimately issued in June of 1970. Neither event was reported to Tech Del despite frequent telexes and letters between Thorp and Power. Shortly after the registration, Thorp applied to the Bureau of Customs and an importation ban went into effect on November 6, 1970. It was only after these matters had been concluded that Thorp, on November 23, 1970, made reference to the registration in a letter.

I infer from the events leading up to the registration of the mark and from the secrecy which surrounded the proceedings in the Patent Office and Customs Bureau that Thorp knew his company did not own the United States right to the MINILITE mark. As Thorp's total investment in advertising and promotion expenses mounted and as the business became more promising, Thorp's interest in being able to have his company use the MINILITE mark grew. So, however, did his realization that he had virtually no protection should Tech Del for any reason decide to market its wheels in the United States through another channel. He felt strongly that he deserved to remain the exclusive outlet by virtue of his efforts in cultivating the market and he seized upon trademark and customs registration as possible avenues to greater security. While there undoubtedly was a great deal of rationalization involved in this process, I am confident that Thorp realized that he had no legal claim to the mark.

Tech Del has proven by clear and convincing evidence that Hank Thorp, Inc. obtained Trademark Registration No. 893,-174 fraudulently as that term is used in Section 33(b)(1) of the Lanham Act, 15 U.S.C. § 1115(b)(1). This means that the registration is reduced from the status of "conclusive evidence of the registrant's exclusive right to use the mark" to the status of "prima facie evidence of registrant's exclusive right to use the mark." Section 33(a), 15 U.S.C. § 1115(a). Since the evidence also shows that Tech Del and not Hank Thorp, Inc. is the owner of the MINILITE mark, Tech Del is entitled to have Registration No. 893,174 cancelled.

## IV.  THE ESTOPPEL ISSUE.

Hank Thorp, Inc. correctly points out that Tech Del learned of its trademark registration in late 1970, and did not challenge Hank Thorp, Inc.'s claim of ownership until April of 1977. By May of 1971, Tech Del concededly knew all of the facts, had consulted counsel, and had been advised that it should seek an assignment of Hank Thorp's

rights in the MINILITE name. Yet the subject of the United States registration was not raised for six years. The remaining question is whether this six year delay in challenging Hank Thorp's title to the United States rights, estops Tech Del from now making that challenge.

■ The equitable doctrine of estoppel requires more for its operation than a delay in asserting a claim. Chief Justice Herrmann outlined the necessary elements of an estoppel in the following passage from *Wilson v. American Insurance Company,* 209 A.2d 902, 903–4 (Del.Supr.1965):

.  .  . An estoppel may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment. *Wolf v. Globe Liquor Co.,* 34 Del.Ch. 312, 103 A.2d 774 (1954); *Employers' Liability Assur. Corp. v. Madric,* Del. [4 Storey 593], 183 A.2d 182 (1962). To establish an estoppel, it must appear that the party claiming the estoppel lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof. See *Ainscow v. Alexander,* 28 Del.Ch. 545, 39 A.2d 54 (1944).

There are at least three reasons why it would be inappropriate to hold that Tech Del is estopped to assert its title to the MINILITE mark. First, Hank Thorp, Inc. was not misled into believing it had other than a licensee's interest in the mark. Through its President, it was fully aware of all relevant facts and knew Tech Del owned the mark. Accordingly, Hank Thorp, Inc. is not in a position to successfully assert an estoppel. As Chief Judge Seitz (then Chancellor Seitz) has stated:

The application of the doctrine of equitable estoppel presupposes that the party's claim is made in the utmost good faith. One who has knowledge of the facts cannot rely in good faith upon words or conduct of another which are inconsistent with the truth.

*Singewald v. Girden,* 37 Del.Ch. 252, 139 A.2d 838, 841 (1958).

■ Second, while silence and inactivity can under some circumstances be sufficiently misleading to provide the basis for an estoppel, they can have that effect only when there is a duty to speak or act or where the facts are such that a failure to speak or act is clearly unreasonable. *See, e. g., Welshire, Inc. v. Harbison,* 32 Del.Ch. 362, 88 A.2d 121 (1952), *aff'd* 33 Del.Ch. 199, 91 A.2d 404 (Supr.Ct.1953); *Hannigan v. Italo-Petroleum Corporation of America,* 7 W.W.Harr. 180, 181 A. 4 (Super.Ct.1935). Here it must be remembered that at no time during the six year period was Hank Thorp, Inc. infringing the mark. The use it made of the mark was authorized by Tech Del and was part of a continuing business arrangement designed to benefit Tech Del as well as Hank Thorp. Given the absence of any adverse use or any other injury to Tech Del during the six year period, I believe it had no duty to challenge Hank Thorp, Inc.'s claim of an interest in the mark and that its failure to do so was not unreasonable.

■ Finally, it is well settled that estoppel requires a prejudicial change of position by the one asserting the estoppel. Here Hank Thorp, Inc. simply did not change position to its detriment in reliance on Tech Del's failure to protest the registration. For five years prior to the spring of 1971, Hank Thorp, Inc. had been marketing MINILITE wheels pursuant to an arrangement under which it paid for most of the advertising and promotion expense of marketing those wheels in the United States. After the commencement that spring of the allegedly misleading silence, Hank Thorp, Inc. continued to market MINILITE wheels in the same manner. While it expended funds on advertising and promotion during the six year period, nothing in the record suggests that these expenditures were materially different from the similar expenditures during the period from 1966 to 1971. Moreover, even if there were some significant difference in Hank Thorp, Inc.'s expenditures during the later period, the rec-

ord does not support the position that this was to its detriment. Indeed, the most reasonable inference is that Hank Thorp, Inc. made a profit on its marketing of MI-NILITE wheels during the 1971 to 1977 period. Thus, on this record I am unable to conclude that Hank Thorp, Inc. changed its position and suffered prejudice as a result of Tech Del's six year forebearance.

### CONCLUSION

Based on the foregoing, I conclude that Hank Thorp, Inc.'s interest in the MINI-LITE mark has at all times been limited to the right to use that mark in connection with the marketing in the United States of MINILITE wheels purchased from Tech Del. It follows that its trademark infringement claim against Tech Del is without merit. Moreover, since Hank Thorp, Inc.'s other unfair competition claim appears to be based on the assumption that it had an exclusive right to use MINILITE and any similar mark in the United States, relief on that claim must also be denied.[4]

Tech Del's prayer that the MINILITE registration be cancelled will be granted and relief from the custom barrier will be provided. While I conclude that Hank Thorp, Inc. has no right to utilize the MI-NILITE mark other than in connection with the sale of Tech Del wheels, no injunction will be issued against Hank Thorp, Inc. because the record fails to support any threat of a broader use of the mark. A trial will be scheduled promptly to determine the amount of any damage to Tech Del and Minilite, Inc. which may have been occasioned by the wrongful registration and customs barrier.

---

4. Plaintiff's unfair competition claim and defendants' anti-trust counterclaim are not developed in the briefing and no further comment by the Court is appropriate.