# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRAMAR RETAIL CENTERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12875-VCL |
| | ) | |
| MARION #2-SEAPORT TRUST U/A/D JUNE 21, 2002 | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 26, 2019
Date Decided: May 22, 2019

Kenneth J. Nachbar, Lauren Neal Bennett, Coleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Edward C. Walton, PROCOPIO, CORY, HARGREAVES & SAVITCH LLP, San Diego, California; *Attorneys for Plaintiff Terramar Retail Centers, LLC*.

Thad J. Bracegirdle, Andrea S. Brooks, WILKS, LUKOFF & BRACEGIRDLE, LLC; Ben D. Whitwell, Melissa C. McLaughlin, VENABLE LLP, Los Angeles, CA; *Attorneys for Defendant Marion #2-Seaport Trust U/A/D June 21, 2002*.

**LASTER, V.C.**

This case concerns the dissolution of Seaport Village Operating Company, LLC (the "Company"), a privately held, manager-managed Delaware limited liability company. When the events giving rise to this litigation unfolded, the Company had three members: (i) Terramar Retail Centers, LLC, (ii) Marion #2-Seaport Trust U/A/D June 21, 2002 (the "Trust"), and (iii) San Diego Seaport Village, Ltd. ("Limited"). Terramar served as the Company's manager.

The Company's LLC agreement gave Terramar the right to exit by offering its member interest to the other members. If the other members did not purchase Terramar's interest within six months, then Terramar could dissolve the Company. In a dissolution, Terramar could sell "all of the property and assets of the Company . . . on such terms and conditions as shall be determined by [Terramar] in its sole and absolute discretion."

In December 2015, Terramar exercised its exit right. The other members failed to purchase Terramar's interest, and Terramar exercised its dissolution right.

The other members disputed whether Terramar had validly exercised its exit right. Terramar responded by filing this action, in which it seeks a declaration that it may dissolve the Company and unilaterally sell its assets to a third party. Terramar also seeks a declaration that it has correctly determined the allocation of the sale proceeds.

After filing this action, Terramar settled with Limited, purchased Limited's member interest, and dismissed Limited from the case. The litigation proceeded against the Trust. This post-trial decision rules in favor of Terramar on all claims.

## I. FACTUAL BACKGROUND

The facts are drawn from the record that the parties crafted during a two-day trial. It consists of 350 exhibits, live testimony from four fact witnesses and two experts, and lodged testimony in the form of twelve deposition transcripts. The parties also agreed to thirty-seven stipulations of fact.[1]

As the party seeking declaratory judgments, Terramar bore the burden of proving the facts necessary to support its claims by a preponderance of the evidence. *See, e.g.*, *San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch. 2009). At the same time, the Trust asserted affirmative defenses and bore the burden of establishing any additional facts necessary to support them, again by a preponderance of the evidence. *See, e.g.*, *Empls.' Liab. Assurance Corp. v. Madric*, 183 A.2d 182, 184 (Del. 1962). Although the competing burdens could complicate fact-finding in theory, the reality is simpler. When the preponderance standard applies, "the burden becomes relevant only when a judge is rooted on the fence post and thus in equipoise . . . ." *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 792 (Del. Ch. 2011) (Strine, C.), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). In this case, the evidence was not in equipoise, and the preponderance-of-the-evidence standard would

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 146. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number. If a trial exhibit used paragraph numbers, then references are by paragraph.

result in the same findings of fact regardless of which party bore the burden of proof.

**A.     Seaport Village, Limited, and Cohen**

Seaport Village is a tourist attraction and specialty shopping center in San Diego, California. The Port of San Diego owns the ground where Seaport Village sits. In 1978, Limited leased the ground from the Port for a period of forty years (the "Seaport Lease"). After securing the Seaport Lease, Limited and its affiliates developed Seaport Village.

To finance the development, Limited borrowed $40 million from Yasuda Trust & Banking Co. Ltd. In 1998, Limited defaulted on the Yasuda loan. For help with a refinancing, Limited turned to non-party Michael A. Cohen and his real estate advisory firm, M.A. Cohen & Company. At trial, Cohen carefully distinguished between himself personally and his firm. For purposes of the facts underlying this case, the distinction is not important. For simplicity, this decision refers simply to Cohen.

With Cohen's assistance, an affiliate of Limited—San Diego Seaport Lending Co., LLC ("Lending")—bought the Yasuda loan for approximately $25 million. As compensation for his services, Cohen received a 50% interest in the net cash flows from Limited and Lending, plus a 50% interest in the net proceeds from any sale of those companies. Through this structure, Cohen obtained the cash-flow rights associated with a 50% equity interest without taking a formal ownership stake.

**B.     Terramar and the Company**

In 2002, Seaport Village needed more financing. Cohen and Limited approached Terramar, a commercial real estate firm. At the time, Terramar was known as GMS Realty. For simplicity, this opinion refers to the entity as "Terramar."

3

As part of a larger restructuring of Seaport Village, the parties formed the Company. The business and affairs of the Company are governed by its LLC agreement dated September 1, 2002 (the "LLC Agreement").

In return for a 50% member interest, Limited subleased the land for Seaport Village to the Company. Limited allocated half of its member interest to Cohen, consistent with the effective split of the cash-flow rights from Limited and Lending. Cohen formed the Trust to hold his 25% member interest. Although the Trust is a separate entity, Cohen makes decisions for the Trust. Under the LLC Agreement, Cohen also received an exclusive right to broker any future financing for the Company. *See* JX 3 § 5.4(b).

In return for the other 50% member interest, Terramar contributed $7 million in capital, guaranteed half of Lending's outstanding loan, and took over the management of Seaport Village. Terramar also became the Company's manager, with "full, exclusive, and complete discretion to manage and control the business affairs of the Company . . . ." *Id.* § 5.1(a). In this capacity, Terramar committed to seek to renew the Seaport Lease and to seek a lease for an adjacent property called Old Police Headquarters (the "Headquarters Lease"), which the parties planned to develop into a shopping center. The LLC Agreement referred to the redevelopment of Old Police Headquarters as "Phase Two."

The LLC Agreement entitled Terramar to receive a priority return of 11.5% per year on its initial capital contribution of $7 million (the "Terramar Priority Return") if (i) the Port failed to approve an extension of the Seaport Lease within thirty months after the Company took possession of Seaport Village and (ii) the extension did not cover at least twenty-five additional years. *Id.* § 4.1(c). If the Terramar Priority Return was triggered,

4

then the Company could not make any *pro rata* distributions to its members until after the Terramar Priority Return was paid. *Id.*

The LLC Agreement allowed Terramar to make capital calls on the Company's members (including itself) if Terramar was unable to obtain third-party financing after "a good faith effort." *Id.* § 3.2(a). The LLC Agreement also gave Terramar the "sole discretion" to cause the Company to obtain a loan from any member (a "Member Loan"), subject to a maximum interest rate of 12%. *Id.* § 3.3.

In the LLC Agreement, Terramar obtained the right to request that the other members buy out its member interest at fair market value at any time after January 1, 2006 (the "Put Right"). *Id.* § 9.5. If the other members did not purchase Terramar's interest within six months, then Terramar could dissolve the Company and receive a contractually determined payout (the "Dissolution Right"). *Id.* § 9.5(d). The LLC Agreement provided that upon Terramar's exercise of the Dissolution Right, "all of the property and assets of the Company shall be sold on such terms and conditions as shall be determined by [Terramar] in its sole and absolute discretion . . . ." *Id.*

In a dissolution, the distribution of proceeds to the Company's members would depend on the applicable contractual waterfall. If Terramar exercised the Dissolution Right after the Terramar Priority Return kicked in, then the waterfall called for distributions to be made as follows:

- First, to repay any interest on any Member Loan;

- Second, to repay the principal of any Member Loan;

- Third, to pay any unpaid priority return of 12% per year on additional capital

5

contributions;

- Fourth, to the members in proportion to the members' additional capital contributions, less any repayments;

- Fifth, to Terramar until the satisfaction of the Terramar Priority Return;

- Sixth, *pro rata* to the members other than Terramar, in an amount equal to the Terramar Priority Return; and

- Seventh, *pro rata* to the members based on their member interest.

*Id.* § 4.1(c).

## C.    The 2010 Capital Call

After the restructuring that brought Terramar into the picture, the Company obtained a $25 million loan from Wells Fargo with a three-year term. On multiple occasions, Wells Fargo agreed to extend the loan, but ultimately declined to extend it beyond 2010. Beginning in 2008, the Company sought to refinance the loan.

In 2010, rather than agreeing to extend the loan, Wells Fargo offered to provide a new loan of $12–15 million, but Wells Fargo conditioned its proposal on receiving a guarantee from Terramar for up to half of the loan amount. *See* JX 34. Other financing sources offered less attractive terms. *See* JX 33. Terramar had no obligation to provide a guarantee and declined to do so.

On July 30, 2010, with bank financing unavailable, Terramar made a capital call on the Company's members. The Trust and Limited refused to participate. Terramar funded the entire capital call, contributing $20,080,000.

## D.    Terramar Seeks to Extend the Seaport Lease and Commences Phase Two.

In 2003, 2007, and 2010, Terramar tried unsuccessfully to obtain an extension of

the Seaport Lease. After striking out for a third time in 2010, Terramar asked the Port to clarify its objectives for Seaport Village. In September 2011, the Port adopted seven visioning goals for redeveloping the property. JX 47 at 1. Terramar responded with a revised plan, and in December 2011, the Port adopted a resolution declaring Terramar's proposal "consistent with the [Port's] visioning goals." PTO ¶ 13.

Around the same time, Terramar secured a forty-year Headquarters Lease and began Phase Two—the redevelopment of Old Police Headquarters. In September 2012, the Company retained Cohen to secure a construction loan for Phase Two.

## E.    The Limited Action

Meanwhile, in April 2012, Limited sued Terramar in the Superior Court of the State of California for the County of San Diego, seeking the dissolution of the Company (the "Limited Action"). Limited alleged that Terramar failed to diligently pursue an extension of the Seaport Lease. Limited also alleged that Terramar provided financing to the Company on unfair terms. The Trust was not a party to the Limited Action.

The Limited Action moved forward in California until August 2013, when the California court held that Limited's claim for dissolution had to proceed in Delaware. Limited promptly refiled its claims in this court.

While the Limited Action was pending, Cohen secured a term sheet from Bank of America, N.A. for a construction loan for Phase Two in the amount of $33.5 million. Bank of America withdrew its offer in February 2013 after Limited and Terramar failed to resolve the Limited Action through mediation. JX 62; *see* Cohen Tr. 269.

In June 2013, Cohen secured another term sheet for a construction loan for Phase

7

Two, again in the amount of $33.5 million, but this time from BMO Harris Bank N.A. Unlike other financing sources, BMO offered to lend notwithstanding the pendency of the Limited Action, as long as Terramar agreed to indemnify BMO for "any costs or losses" resulting from the litigation. JX 70 at '072; *see* Cohen Tr. 332–33. Terramar had no obligation to provide indemnification and declined. The BMO loan fell through.

At this point, there was no third-party financing available to the Company, and Terramar supplied the Company with Member Loans totaling $16.3 million. The Company used the Member Loans and cash flows from Seaport Village to redevelop Old Police Headquarters, expending a total of $46.5 million for construction.

Old Police Headquarters opened for business in November 2013. Its tenants have included the Cheesecake Factory, Sunglass Hut, and Starbucks.

## F. Renewed Financing Efforts

In March 2014, the Company retained Cohen to help refinance the outstanding Members Loans. Cohen contacted approximately two dozen lenders. Most were uninterested, citing some combination of the Limited Action, the expiring Seaport Lease, and the Company's request for a non-recourse loan. One lender asked Terramar to guarantee the loan, which Terramar declined to do.

In July 2015, Cohen secured a term sheet from NorthStar Realty Finance for a loan in the amount of $36.65 million on attractive terms. NorthStar insisted on modifications to

the Headquarters Lease that the Port refused to accept, and the refinancing fell apart.[2]

## G.      The Port Changes Its Mind.

In June 2015, Terramar completed a long-term project to update its redevelopment plan for Seaport Village. Terramar and Cohen believed that the updated proposal was even better than the one the Port had endorsed in 2011.

But the Port opted for a different path. The Board of Port Commissioners invited Terramar to present its proposal at a hearing on October 6, 2015. Four days before the hearing, the Port staff informed Terramar that they would recommend that the board reject Terramar's proposal. Terramar responded with a six-page rebuttal letter, which a Terramar representative read into the record at the hearing. The board nevertheless decided not to extend the Seaport Lease, and the board formally rescinded the visioning goals on which Terramar's proposal had relied. The Port instead endorsed a new vision to redevelop the broader waterfront.

## H.      The Trust Settles With Terramar.

After Limited refiled the Limited Action in 2013, the Trust threatened to assert similar claims against Terramar. *See* JX 68. In June 2014, Cohen offered to settle the Trust's claims for $2 million, but the parties could not agree on terms. JX 89; *see* JX 92.

In August 2015, the Limited Action went to trial in this court. After trial, the Trust and Terramar reached a settlement (the "Settlement Agreement"). *See* JX 138. In exchange

---

[2] JX 173; Lee Tr. 446–50; *see* JX 141 at '407–09; JX 165; JX 168; JX 169.

for a payment of $400,000 and a reciprocal release, Cohen released Terramar from all claims relating to the Company that existed as of the Settlement Agreement's effective date of October 2, 2015. The release carved out a claim against Terramar for allocating phantom income to the Trust, which had not been tried in the Limited Action. By settling, Cohen made a tactical decision to release challenges that seemed likely to fail based on the trial in the Limited Action, while preserving the untried claim.

On November 9, 2015, this court rendered its post-trial decision in the Limited Action, ruling in favor of Terramar on all claims. *Seaport Village Ltd. v. Terramar Retail Ctrs., LLC*, C.A. No. 8841-VCL, at 85–101 (Del. Ch. Nov. 9, 2015) (TRANSCRIPT), *aff'd*, 148 A.3d 1170, 2016 WL 5373085 (Del. Sept. 26, 2016) (ORDER).

## I.  Terramar Exercises the Put Right.

By the end of 2015, Terramar had decided that the Company was no longer an attractive investment. *See* Zwieg Tr. 42, 55–67. Under Section 9.5 of the LLC Agreement, Terramar could exercise the Put Right by sending "a notice . . . indicating to all other Members and to the Company that [Terramar] desires to have its interest purchased by the other Members of the Company." This decision refers to that document as the "Terramar Buy-Out Notice."

Section 9.5(a) specified that the Terramar Buy-Out Notice had to contain "a statement of [Terramar's] opinion" of the following two items:

> (i) the fair market value of the Company (the "***Company Fair Market Value***") taking into account the fair market value of the Project [*i.e.*, the Seaport Lease and the Headquarters Lease] (as determined, if necessary, in the manner set forth below) and all other assets of the Company, and all liabilities thereof, including the Yasuda Loan, and hypothetical sales

10

expenses of three percent (3%) of the gross value, and

> (ii) the amount (the "***[Terramar] Purchase Price***") equal to

>> (A) the amount that would be distributed to [Terramar] pursuant to Section 4.1(b) and/or 4.1(c), as applicable, if a hypothetical cash sale of the assets of the Company subject to such liabilities resulted in net proceeds to the Company equal to the Company Fair Market Value, <u>plus</u>

>> (B) an amount equal to the value of the Percentage Fee Amount reasonably anticipated to be received by [Terramar] from and after the date of the [Terramar] Buy-Out Notice in accordance with the provisions of Section 4.8 hereof, which the parties hereto agree shall be equal to the average Percentage Fee Amount for the three consecutive twelve (12) month periods ending on the last day of the month immediately preceding the month in which the [Terramar] Buy-Out Notice is delivered by [Terramar], divided by the "cap rate" applied by the parties in determining the Company Fair Market Value (or if the parties cannot agree on a cap rate, the rate selected by the Appraiser (as described below), and if there is more than one Appraiser, the average cap rate selected by all Appraisers), <u>plus</u>

>> (C) would be paid [*sic*] to [Terramar] or its affiliates upon repayment of any loan to the Company by [Terramar] or its Affiliates.

JX 3 § 9.5(a) (formatting added). This decision uses "Company Fair Market Value" and "Terramar Purchase Price" as defined in Section 9.5(a) of the LLC Agreement.

On December 18, 2015, Terramar sent the Terramar Buy-Out Notice to Limited and the Trust. The notice stated:

> The purpose of this letter is to advise you that pursuant to Section 9.5 of the [LLC Agreement], [Terramar] desires to have its membership interest in [the Company] purchased by [Limited] and [the Trust]. Pursuant to the terms of Section 9.5(a) of the [LLC Agreement], the following information is provided:

>> 1. The "Company Fair Market Value" is $42,932,927.

>> 2. The "[Terramar] Purchase Price" equals $55,445,552.

> Please refer to Section 9.5 of the [LLC Agreement] for the specific

requirements and time constraints it imposes.

JX 147. A key component of the Terramar Purchase Price was the amount that Terramar would receive under the waterfall provisions in the LLC Agreement if the Company sold all of its assets for an amount equal to Company Fair Market Value (the "Waterfall Amount").[3] Terramar believed its waterfall priorities were greater than the Company Fair Market Value. Terramar thus specified a Waterfall Amount equal to Company Fair Market Value.[4] Another key component of the Terramar Purchase Price was the balance on Terramar's Member Loans. Tracking the definition of the Terramar Purchase Price, Terramar calculated a Terramar Purchase Price that equaled the Company Fair Market Value plus the Terramar Member Loans. Pettit Tr. 401–05.

Under Section 9.5(b) of the LLC Agreement, the Company Fair Market Value as stated in the Terramar Buy-Out Notice would become the purchase price for the Put Right "unless the other parties dispute in writing . . . such amount within ten (10) business days." On January 5 and 6, 2016, the Trust and Limited sent notices disputing Terramar's opinion of Company Fair Market Value.[5]

---

[3] *See* JX 3 § 9.5(a) (defining the first input to the Terramar Purchase Price as "the amount that would be distributed to [Terramar] pursuant to Section 4.1(b) and/or 4.1(c), as applicable, if a hypothetical cash sale of the assets of the Company subject to such liabilities resulted in net proceeds to the Company equal to the Company Fair Market Value").

[4] *See* Pettit Tr. 401–02; Taylor Tr. 470–71; JX 190; *see also* Cohen Tr. 356–57.

[5] PTO ¶ 24; JX 151; JX 152. Limited and the Trust also disagreed with Terramar's assessment of the Terramar Purchase Price (and therefore the Waterfall Amount). The LLC Agreement did not contain a mechanism for resolving that dispute.

12

The dispute notices triggered a contractual valuation procedure in which parties first were obligated to negotiate "in good faith, [to] attempt to reach a mutually acceptable Company Fair Market Value." JX 3 § 9.5(c). If the parties could not agree within thirty days, then Terramar would select one appraiser, the other members would select a second appraiser, and the two appraisers would jointly select a third appraiser. Each appraiser would "independently determine the fair market value of the Project and the other assets of the Company, the amount of the liabilities of the Company, and the consequent Company Fair Market Value." *Id.* The Company Fair Market Value would be "the average of the two closest appraisals." *Id.*

As part of its notice of dispute, the Trust asked for the calculations underlying Terramar's opinions on Company Fair Market Value and the Terramar Purchase Price. The Trust also asked Terramar to "cooperate in providing information that may be disclosed to potential purchasers on a confidential basis." JX 151. The Trust's letter explained that

> Mr. Cohen would like to discuss with someone at Terramar the most efficient way to obtain and prepare information that can be provided to potential buyers and achieve a sales price that is satisfactory to Terramar. In the event that Mr. Cohen is successful in identifying a buyer, please confirm that Mr. Cohen's firm will receive the standard broker fee. Under Article 9.5, Company Fair Market Value assumes "sales expenses of three percent (3%) of the gross value" in connection with a sale to a willing buyer, so this should not be an issue.

*Id.* The Trust's interest in running a third-party sale process ran contrary to the terms of the Put Right, which contemplated the other members purchasing Terramar interest.

Between January 11 and January 19, 2016, Terramar provided the Trust with the

13

Company's most recent financial statements, rent rolls, and leasing reports.[6] On January 20, Terramar offered to provide more information if the Trust agreed to a non-disclosure agreement (an "NDA"). The Trust never responded. Zwieg Tr. 63; *see* Cohen Tr. 248–49.

After the Trust went silent, Terramar reasonably concluded that the Trust had stopped participating in the buy-out negotiations. On February 4, 2016, the negotiation period reached its contractual end date without any agreement on Company Fair Market Value. At that point, Section 9.5(c) of the LLC Agreement gave the parties five business days to select appraisers. Terramar and Limited appointed appraisers; the Trust did not participate. The two party appraisers then jointly selected a third appraiser.

Around this time, Cohen called Terramar's CEO, Hugh Zwieg, to propose that the Desert Troon Companies and the Trust purchase Terramar's member interest. On February 9, 2016, Cohen emailed Zwieg to confirm that his buyer group actually wanted to purchase the Company's assets, not Terramar's member interest. *See* JX 179. The next day, Terramar rejected the proposal. Terramar's outside counsel informed Cohen that Section 9.5 of the LLC Agreement prohibited Terramar from selling the Company's assets during the Put Right process, which contemplated a sale of Terramar's interest to the other members. If the Trust wanted to purchase the Company's assets, it could do so as part of the dissolution phase, if the process went that far. JX 182.

---

[6] JX 153; JX 156; JX 157; JX 159; *see* Cohen Tr. 352–53 (agreeing that Terramar provided "substantial information" about the Company).

14

**J.      The Appraisals and the Determination of Company Fair Market Value**

On June 9, 2016, the appraisers completed their work. The three appraisers each valued the Seaport Lease and the Headquarters Lease, with Terramar's appraiser reaching a valuation conclusion of $56,350,000, Limited's appraiser reaching a valuation conclusion of $56,800,000, and the jointly retained appraiser reaching a valuation conclusion of $54,300,000.

Using the appraisals, Terramar calculated Company Fair Market Value. Terramar averaged the two closest appraisals to derive a value for the leases, added $2,233,967 to account for the value of the Company's non-lease assets (primarily cash and accounts receivable), and deducted $1,255,680 from each appraisal, representing the value of the liabilities other than the Terramar Member Loans. This calculation generated a figure of $57,503,287. JX 231.

By proceeding in this fashion, Terramar and the appraisers did not strictly comply with Section 9.5(c) of the LLC Agreement. Section 9.5(c) anticipated that the appraisers would "determine the fair market value of the Project and the other assets of the Company, the amount of the liabilities of the Company, and the consequent Company Fair Market Value," with the average of the two closest appraisals establishing the Company Fair Market Value. Instead, all three appraisers only valued the leases, suggesting that the parties instructed their appraisers on this point. Terramar then used the average of the two closest appraisals when making its own calculation. Terramar also excluded the Member Loans when calculating Company Fair Market Value, resulting in a higher Company Fair Market Value than the calculation otherwise would have generated.

15

The Trust, however, has not challenged these aspects of the process. The Trust disputes Terramar's initial opinion as to Company Fair Market Value in the Terramar Buy-Out Notice, but not the subsequent calculation of Company Fair Market Value based on the appraisals. The absence of any dispute on this point is likely explained by the following fact: Using the appraisers' valuations of the leases to calculate Company Fair Market Value in accordance with Section 9.5(c) results in a number that is effectively the same as Terramar's initial opinion of Company Fair Market Value.

The appraisers should have valued all of the Company's assets and liabilities. It is undisputed that the non-lease assets totaled $2,233,967, and the liabilities other than the Terramar Member Loans totaled $1,255,680. Assuming $12,512,625 was owed on the Terramar Member Loans, and taking the additional deduction specified in Section 9.5(a) for hypothetical sales expenses equal to 3% of the gross value, the appraisers should have reached the following figures for Company Fair Market Value: $43,058,143 (Terramar's appraiser), $43,494,643 (Limited's appraiser), and $41,069,643 (the jointly selected appraiser). Averaging the two closest figures yields a Company Fair Market Value of $43,276,393. The Terramar Buy-Out Notice identified a Company Fair Market Value of $42,932,927, or $343,466 less than (and within 1% of) what the appraisal process generated.

Ultimately, the failure to strictly follow Section 9.5(c) was immaterial. To purchase Terramar's member interest under the Put Right, the other members had to be willing to pay the Terramar Purchase Price, which started with the Company Fair Market Value and then added the value of the Member Loans. In round numbers, adding the Member Loans

16

of approximately $12 million to the appraisal-based Company Fair Market Value of approximately $43 million would yield a Terramar Purchase Price of approximately $55 million. By the time the appraisal process concluded in June 2016, it was evident that Limited and the Trust would not buy Terramar's interest at anything close to $55 million. Cohen refused to disclose his upper bound, but testified at trial that he would have expected to pay "a lot less" than $55 million. *See* Cohen Tr. 365.

Anticipating that it would have to exercise the Dissolution Right, Terramar proposed to sell the Company before the Dissolution Right ripened and to escrow the sale proceeds until the parties resolved their disputes. JX 231 at 2; Zwieg Tr. 71–73. Cohen refused. He insisted that Terramar agree in advance to share sale proceeds with the Trust. Cohen Tr. 371–73.

The parties ended up extending the buy-out period until November 9, 2016. JX 202. That date came and went without the other members purchasing Terramar's interest. As a result, Terramar gained the ability under the Dissolution Right to "cause the dissolution of the Company," at which point "all of the property and assets of the Company shall be sold on such terms and conditions as shall be determined by [Terramar] in its sole and absolute discretion." JX 3 § 9.5(d).

## K.    Litigation and the Sale Process

Because Limited and the Trust had raised objections to Terramar's exercise of the Put Right that remained unresolved, Terramar filed this action against Limited and the Trust. In early December 2016, Zwieg met with Cohen and a representative of Limited, but nothing was settled. *See* Zwieg Tr. 51–53; Zwieg Dep. 120–21. In January 2017, Limited

sold its 25% member interest to Terramar for $1.3 million. JX 266. As a result, Terramar and the Trust became the Company's only remaining members, and Terramar stipulated to the dismissal of Limited from this action with prejudice.

In July 2017, the Trust sued Terramar in the Superior Court of the State of California for the County of Los Angeles (the "California Action"). The Trust asserted claims for breach of fiduciary duty, breach of the LLC Agreement, and breach of the implied covenant of good faith and fair dealing. The Trust sought declarations that Terramar (i) may not sell the Company's assets without the Trust's consent, (ii) invalidly purchased Limited's member interest, and (iii) is not entitled to the Terramar Priority Return. JX 310.

In the first quarter of 2017, Terramar hired CBRE Group, Inc. to market the Company's assets. By September 2017, six parties had submitted bids. The high bidder offered $42.5 million for the Headquarters Lease and $2.5 million for the Seaport Lease. JX 287; Zwieg Tr. 91–94. But in November, Terramar terminated the sales process, citing an interlocutory appeal pending in this case and the Trust's request for a declaration in the California Action that it could unilaterally block an asset sale. JX 296; *see id.* (citing "further delay and uncertainty"); JX 297.

## L. The Litigation Continues.

Meanwhile, the litigation in this court remained ongoing. In February 2017, the Trust had moved to dismiss this action for lack of personal jurisdiction. After I denied the Trust's motion, the Trust moved for reargument. After I denied that motion, the Trust sought to certify an interlocutory appeal. I granted the application, and the Delaware Supreme Court accepted the appeal. By order dated April 20, 2018, the Delaware Supreme

18

Court affirmed this court's rulings on personal jurisdiction.

While the motion to dismiss was pending, the parties did not move forward with discovery. Even after the Delaware Supreme Court's ruling, the Trust refused to answer or agree to a case schedule. In May 2018, the Trust moved to dismiss a second time, claiming that the doctrine of *forum non conveniens* required deference to the later-filed California Action. Understandably perceiving the Trust's motion as a delay tactic, Terramar sought entry of a scheduling order. On June 14, 2018, I entered a scheduling order, without prejudice to the Trust's pending motion to dismiss. Trial was set for January 2019.

In its motion to dismiss, the Trust asserted it was more efficient to proceed in California, where the Trust had asserted wide-ranging claims against Terramar. The amended complaint in the California Action contended that since October 2015, Terramar:

- induced the Trust to enter into the Settlement Agreement by failing to disclose that the Port would soon decline to extend the Seaport Lease;

- failed to take steps that could have resulted in an extension of the Seaport Lease;

- continued the Company's high-interest indebtedness to Terramar by sabotaging the low-interest NorthStar refinancing;

- exercised the Put Right as a path to the Dissolution Right, circumventing a provision in the LLC Agreement that required 75% of the member interest to approve a large asset sale;

- prevented the Trust from accepting the put by refusing to negotiate price and insisting that the Trust and Limited jointly purchase Terramar's interest;

- diverted Company assets to fund its purchase of Limited's member interest; and

- attempted to force a liquidation of the Company's assets on terms that unfairly allocate all of the proceeds to Terramar.

In June, the Trust filed its answer in this case and raised affirmative defenses that

19

incorporated all but two of these allegations. The affirmative defenses did not contend that Terramar wrongfully induced the Trust to enter into the Settlement Agreement or that Terramar diverted Company assets to buy out Limited. *See, e.g.*, Answer ¶ 17 ("Both Terramar and the Cohen Trust have raised issues relating to the 2015 Settlement Agreement and . . . those issues must be decided by the Superior Court of the State of California.").

In August 2018, I denied the Trust's second motion to dismiss. As with its first motion, the Trust moved for reargument. The Trust asked to exclude from this case aspects of its affirmative defenses that it wished to litigate in California. Alternatively, the Trust asked to postpone the trial.

Meanwhile, the Trust engaged in self-help on its request for a postponement. The scheduling order had set August 31, 2018, as the deadline for the parties to substantially complete document production. By that point, the Trust had produced only 297 documents.

In September 2018, I denied the Trust's motion for reargument. Because of the Trust's opposition, Terramar did not take Cohen's deposition until October 16, 2018. Only then, after the deposition, did the Trust produce 98.4% of its documents—twenty-two times what the Trust had produced by the substantial completion date.

After its massive document production, the Trust changed its tune and moved for leave to file all of its claims in the California Action as counterclaims in this case. In December 2018, I denied leave to amend and awarded sanctions to Terramar, finding that the Trust had used improper tactics "to create holdup value in the dissolution process" and had "engaged in serial efforts to delay" the litigation pending in this court. *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *1, *15

20

(Del. Ch. Dec. 4, 2018). The sanctions included an order excluding the belatedly produced documents. The case proceeded to trial as scheduled.

## II. LEGAL ANALYSIS

Terramar contends that it complied with the requirements in the LLC Agreement for dissolving the Company, and it seeks to exercise its right to sell the Company's assets. Terramar contends that its proposed allocation of the sale proceeds complies with the LLC Agreement.

The Trust argues that Terramar breached the requirements in the LLC Agreement for dissolving the Company. The Trust asserts that the Terramar Buy-Out Notice misrepresented Terramar's opinion of Company Fair Market Value and overstated the Terramar Purchase Price. The Trust also contends that Terramar withheld financial information necessary for the Trust to decide whether to buy Terramar's member interest. The Trust further argues that Terramar wrongfully insisted that the Trust and Limited jointly purchase Terramar's interest, refused to cooperate with the Trust's capital source, and negotiated with the Trust in bad faith.

This decision rejects the Trust's theories. Terramar complied with the requirements of the LLC Agreement and is entitled to sell the Company's assets to a third party.

The parties also dispute how to allocate the proceeds from an asset sale. The Trust concedes that based on the current state of the Company, Terramar has proposed the correct allocation. The Trust instead posits that the allocation should rest on a counterfactual state of affairs in which Terramar had operated and financed the Company differently between 2003 and 2017. According to the Trust, the counterfactual exercise is necessary because

Terramar committed misconduct throughout the Company's history. This decision rejects those theories as well.

With one exception, the Settlement Agreement released all of the Trust's challenges that arise from events that occurred before October 2, 2015. Challenges from that era are also time-barred. The few timely challenges crumble under the weight of the evidence.

Finally, the Trust broadly repackages its claims of wrongdoing under three other headings. The first two invoke the doctrines of unclean hands and equitable estoppel, but the assertions supporting those affirmative defenses have the same factual and legal shortcomings as their original iterations. The third heading is the implied covenant of good faith and fair dealing, but that doctrine has no role because the express terms of the contract govern.

## A. Disputes Over the Contractual Dissolution Procedure

Terramar contends that it complied with the contractual dissolution procedure set forth in Section 9.5 of the LLC Agreement. The Trust argues that Terramar breached Section 9.5 repeatedly. The Trust also recasts one of its contract arguments as a claim for breach of the duty of disclosure.

### 1. Claims About Company Fair Market Value

The Trust contends that Terramar intentionally overstated the Company Fair Market Value in the Terramar Buy-Out Notice, thereby breaching the LLC Agreement and Terramar's duty of disclosure. As the Trust sees it, Terramar inflated the inputs to its calculation of Company Fair Market Value so that it could name the highest possible number as its Terramar Purchase Price.

### a. Breach of Contract

Section 9.5(a) of the LLC Agreement required the Terramar Buy-Out Notice to contain a "statement of [Terramar's] opinion of" the Company Fair Market Value and the Terramar Purchase Price. The Terramar Buy-Out Notice specified a Company Fair Market Value of $42,932,927 and a Terramar Purchase Price of $55,445,552. As of December 31, 2015, Terramar believed that its waterfall priorities totaled $55,774,743.03. *See* JX 190. The Trust asserts that Terramar breached Section 9.5(a) because Terramar's true opinion of Company Fair Market Value was less than $31 million.

The ideal starting point for analyzing the Trust's challenge would be Terramar's underlying calculations, but Terramar invoked privilege for those documents and never produced them.[7] Despite the resulting gap in the evidentiary record, the evidence at trial showed that the figures in the Terramar Buy-Out Notice were justified and reflected Terramar's actual belief.

> Section 9.5(a) of the LLC Agreement defined "Company Fair Market Value" as
>
> the fair market value of the Company . . . taking into account the fair market value of the Project [*i.e.*, the Seaport Lease and the Headquarters Lease] . . . and all other assets of the Company, and all liabilities thereof, including the Yasuda Loan, and hypothetical sales expenses of three percent (3%) of the gross value . . . .

Tim Pettit, Terramar's CFO, testified that Terramar adhered to this formulation when

---

[7] *See* Dkt. 158 at 20 (Terramar's counsel explaining that Terramar regarded the documents as privileged because "we were in active litigation with Limited at the time" and "decisions were made with advice of counsel and counsel was consulted at every step of the way").

specifying a Company Fair Market Value of $42,932,927. He explained that the Headquarters Lease and the Seaport Lease comprised the bulk of the Company's asset value, and Terramar valued them at approximately $56.8 million. Terramar's Member Loans comprised the bulk of the Company's liabilities, and Terramar valued them at approximately $12.5 million.[8]

Pettit testified that Terramar valued the Headquarters Lease at $42.8 million after consulting two third-party appraisals. In an appraisal dated October 2, 2015, Cushman & Wakefield Western, Inc. valued the Headquarters Lease at $46.8 million as of August 2015 and at $52.2 million as of September 2018. JX 119 at '331. Terramar averaged the lower Cushman figure with an earlier appraisal from August 2014, which Terramar updated to reflect subsequent capital expenditures. *See* Pettit Dep. 68–69, 111–12; Pettit Tr. 400. Terramar did not produce the 2014 appraisal, but Pettit's testimony implied that it was in the range of $38.8 million. If Terramar had wanted to maximize the Company Fair Market Value, as the Trust contends, then it could have relied solely on the future valuation from the Cushman appraisal and placed a value on the Headquarters Lease that was almost $10 million higher. That in turn would have increased the Company Fair Market Value. Terramar instead used a lower, blended valuation.

Pettit testified that Terramar valued the Seaport Lease at approximately $14 million by applying a 15% discount rate to the expected net operating income over the lease's

---

[8] Pettit Tr. 399–401; *see* Pettit Dep. 69; Zwieg Tr. 58.

remaining life of roughly 2.75 years. Pettit Tr. 400, 412. Pettit referenced projected net operating income of $6.25–6.5 million annually. The documentary record did not support those exact amounts, but it came close. In 2014, Seaport Village generated net operating income of $5,593,777. In 2015, it was $5,637,400. For 2016, the Company projected $6,124,296. JX 226 at '077.

Based on an internal Terramar spreadsheet, the Trust contends that Terramar actually thought the leases were worth approximately $12.2 million less than the figure implied by the Terramar Buy-Out Notice. The spreadsheet, titled "Seaport Waterfall_9.30.2018_Annual," was created for settlement purposes and provided to Terramar's expert, but it contains data that once had a business purpose. In a tab titled "Sell Today @ end of 2015," the spreadsheet valued the Seaport Lease at $9,562,544 and the Headquarters Lease at $34,996,133, or roughly $12.2 million lower than the value that Pettit said Terramar placed on the leases. JX 317.

At trial, no one could say when Terramar computed the figures in the "Sell Today" tab. In February 2014, Terramar's then-CFO emailed an earlier version of the tab to Cohen.[9] In 2015, someone updated the spreadsheet to reflect the Company's 2014 audited

---

[9] JX 73; *see* Pettit Tr. 409 (describing the "Sell Today" tab as "a further iteration of the Wendy Godoy file from February 27, 2014"). *See generally* Pettit Dep. 13–31. Terramar contends that the lease values in the "Sell Today" tab are unreliable because they were hard-coded. Although it is true that the values were hard-coded, the value for the Headquarters Lease matches what the calculation would be using a reasonable 7.5% capitalization rate. The hard-coded value for the Seaport Lease matched a calculated value reached in a different cell.

financials.[10] Pettit, who joined Terramar in April 2015, indicated that his team never used the "Sell Today" tab in the ordinary course of business. *See* Pettit Tr. 409–10. Pettit also testified that Terramar's audited financials reported the asset values reflected in the Terramar Buy-Out Notice,[11] although the Company's audited financials in fact used values closer to the "Sell Today" tab's. *See* JX 104; JX 212.

The evidence on this question is close, but it tips in Terramar's favor. Section 9.5(a) of the LLC Agreement required that Terramar form an opinion of fair market value that took specified elements into account. Pettit testified credibly that the Terramar Buy-Out Notice reflected Terramar's actual opinion of Company Fair Market Value. *See* Pettit Tr. 413. Even the Trust's expert acknowledged the subjectivity of opinions about fair market value. *See* McNiff Dep. 303–04.

The Cushman appraisal validates the reasonableness of Terramar's figure and Pettit's testimony. Northstar obtained the appraisal when considering a loan to the Company. The appraisal valued the Headquarters Lease as of August 2015 at $46.8 million, just $10 million less than the aggregate lease value implied by the Terramar Buy-Out

---

[10] *See* Pettit Tr. 416 ("Q. Okay. So at least as of the time this was prepared, there were actual numbers from financial statements that had been generated through 2014. Is that right? A. That is correct. Q. So this was prepared sometime in 2015. Correct? A. Yes, it was updated, as I think I testified to."). *Compare* JX 104 at '534 (cash flows from audited 2014 financials), *with* JX 317 ("Sell Today" tab with overlapping figures).

[11] *Id.* at 412–13; *see id.* at 412 ("Q. What were the values for Seaport Village and OPH that Terramar reported in its financial statements in 2015? A. 42.8 and approximately 14 million.").

Notice ($56.8 million). Terramar in fact valued the Seaport Lease at $14 million, suggesting that its overall valuation was conservative.[12]

After Terramar issued the Terramar Buy-Out Notice, subsequent events corroborated its opinion of Company Fair Market Value. Although later evidence cannot prove what Terramar subjectively believed in December 2015, it can reinforce or undercut the credibility of Terramar's assertion.

One source of subsequent evidence is the appraisal process, where the appraisers generated the following figures for the leases:

| Appraiser | Headquarters Lease | Seaport Lease | Total |
|---|---|---|---|
| Terramar's Appraiser | $43,400,000 | $12,950,000 | $56,350,000 |
| Limited's Appraiser | $44,300,000 | $12,500,000 | $56,800,000 |
| Joint Appraiser | $44,000,000 | $10,300,000 | $54,300,000 |
| Terramar Buy-Out Notice | $42,800,000 | $14,000,000 | $56,800,000 |

All of the appraisals cluster in the same range, with the lease value from the Terramar Buy-Out Notice matching the valuation from Limited's appraiser in a context where Limited's interests aligned with the Trust's.

Another source of subsequent evidence is the bids received in September 2017. One year and nine months after the Terramar Buy-Out Notice, the high bidder valued the

---

[12] The Trust contends that the Cushman appraisal made unrealistically high assumptions regarding the net operating income and occupancy rate of Old Police Headquarters. *See* Cohen Tr. 279–81. I intimate no view on this assertion. Market participants were free to value the Headquarters Lease based on the assumptions they deemed appropriate. For purposes of corroborating Terramar's assessment of Company Fair Market Value, it matters that a third-party lender negotiating at arm's length paid for and relied upon the Cushman appraisal.

Headquarters Lease at $42.5 million, which is consistent with Terramar's valuation. Although the Trust questions the probative value of the bid because it was conditioned on due diligence, the evidence persuades me that the bid was credible and probative of fair value. *See* JX 287 (showing pattern of serious bidding involving increasing offers); JX 297 (showing high bidder's dismay at Terramar's cancellation of sale process).

If the values from the appraisals or the later bidders had been dramatically lower than Terramar's figure, then it would have supported the Trust's claim that Terramar inflated its opinion of value. Instead, the values from the appraisals and the later bidders corroborated Terramar's opinion. The evidence also shows that if Terramar had wanted to inflate its valuation, it could have easily done so by relying only on the Cushman appraisal. On balance, the evidence supports Pettit's testimony and shows that Terramar complied with its contractual obligations by including its opinion of Company Fair Market Value in the Terramar Buy-Out Notice. Terramar subjectively believed the value it specified, and that value was reasonable.[13]

---

[13] Even assuming that the Trust proved Terramar did not subjectively believe its valuation, that finding would not lead to the do-over that the Trust wants. The Trust contends that a do-over would be necessary because Section 9.5's requirements are conditions precedent to dissolution. The parties did not brief the law of conditions precedent, so I am not in a position to assess this contention. But it bears noting that Section 9.5 contains a series of requirements, and it is not clear to me that strict compliance with every one of them would be required. The critical input for exercising the Put Right was a determination of Company Fair Market Value. The Terramar Buy-Out Notice was the initial step towards establishing Company Fair Market Value, but it was not the definitive step. Because of the possibility of disputes over Terramar's valuation, the LLC Agreement included the appraisal procedure. If Terramar had overstated its valuation, then the corrective measure was for the parties to follow the appraisal procedure, as they did (with

28

### b. Breach of Fiduciary Duty

The Trust contends that Terramar breached its duty of disclosure by intentionally overstating the Company Fair Market Value in the Terramar Buy-Out Notice. As the Company's managing member, Terramar owed a "fiduciary duty to disclose fully and fairly all material information within [its] control when [seeking] action" from the other members.[14] Although there was conflicting evidence on this point, I have found that the Terramar Buy-Out Notice accurately disclosed Terramar's opinion of the Company Fair Market Value. Terramar therefore committed no breach.

### 2. Claims About the Terramar Purchase Price

Just as the Trust contends (incorrectly) that Terramar overstated the Company Fair Market Value in the Terramar Buy-Out Notice, the Trust also contends that Terramar overstated the Terramar Purchase Price. The Terramar Buy-Out Notice reflected a Terramar Purchase Price of $55,445,552. That figure equals the Waterfall Amount plus the amount owed on Terramar's Member Loans. Pettit Tr. 401–04, 423–25.

---

the Trust declining to participate). That process established the Company Fair Market Value. It thus seems unlikely to me that any overstatement in the Terramar Buy-Out Notice would lead to a do-over. I also doubt that a do-over would follow because the evidence shows that any counterfactual breach by Terramar was immaterial to Cohen. He was not going to buy Terramar's units at anything approaching the value that resulted from the appraisal process.

[14] *See Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("Managers and managing members owe default fiduciary duties; passive members do not."); *see also Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) ("Delaware law also protects shareholders who receive false communications from directors even in the absence of a request for shareholder action.").

The Trust concedes the math, but argues that the Waterfall Amount would have been lower if not for Terramar's past mismanagement. But Terramar reached its opinion based on the actual Waterfall Amount. Under the LLC Agreement, Terramar had no obligation to adopt the Trust's counterfactual view. The same is true as a matter of fiduciary duty, where the Trust had no obligation to disclose a figure based on self-flagellation. Terramar complied with its contractual obligations and fiduciary duties when giving its opinion of the Terramar Purchase Price.

### 3. Claims About Bad Faith Negotiation

Under Section 9.5(c) of the LLC Agreement, after a minority member disputes the contents of the Terramar Buy-Out Notice, the parties "shall, in good faith, attempt to reach a mutually acceptable Company Fair Market Value." If the parties failed to reach agreement within thirty days, then the appraisal procedure would begin. The Trust contends that Terramar breached Section 9.5(c) by negotiating in bad faith.

### a. Failure to Provide Information

The Trust argues that Terramar negotiated in bad faith by failing to provide information about the opinions in the Terramar Buy-Out Notice about Company Fair Market Value and Terramar Purchase Price. In its notice of dispute, the Trust asked Terramar to "provide details on the assumptions and calculations" underlying those opinions. JX 151. The Trust argues that Terramar improperly withheld those details.

Terramar offered to provide the information that the Trust requested, as long as the Trust agreed to an NDA. Terramar sent Cohen a proposed NDA and asked for comments. JX 160. Cohen didn't respond. *See* Cohen Tr. 249 (admitting "it would have been a good

30

idea" to respond). Once Cohen gave Terramar the silent treatment, Terramar had no reason to do more.

The Trust argues that Terramar showed it was not interested in dialogue by proposing an NDA that was too restrictive. The Trust objects that Terramar's proposal did not allow Cohen to provide information to third parties, like Desert Troon, but that is exactly why Terramar wanted an NDA. Cohen had raised red flags by asking to market the Company's assets to third parties, and Terramar correctly believed that the LLC Agreement did not permit an asset sale or marketing to third parties before the dissolution stage. *See* Zwieg Tr. 59–60; JX 182. If Cohen had been interested in using Desert Troon to finance a joint purchase of Terramar's member interest with Limited, then he should have engaged with Terramar and marked up the NDA to permit that. Terramar's NDA proposal did not evidence bad faith.

The Trust also has not explained why it needed the numbers underlying Terramar's estimates to be able to negotiate with Terramar. Commercial parties commonly negotiate in good faith without sharing their underlying calculations. As the Trust's expert admitted at trial, Cohen possessed sufficient information to form an independent judgment about Company Fair Market Value. McNiff Tr. 533–36; *accord* McNiff Dep. 304–05. Cohen was an original recipient of the Cushman appraisal, and he had received financial statements and supporting data in the ordinary course of business as the Company's broker.[15] After

---

[15] *See* JX 98; JX 106; JX 111; JX 141; JX 142; Cohen Tr. 354–56.

31

receiving the notices of dispute, Terramar sent Cohen the Company's current balance sheet and income statement, as well as statements for Old Police Headquarters and Seaport Village. JX 156. When updated statements became available, Terramar promptly sent those too. JX 159. To help Cohen understand the Terramar Purchase Price, Terramar sent the Trust a chart of its waterfall priorities. JX 190. Terramar's expert noted that Cohen could have determined Terramar's waterfall priorities based on the Company's audited financials and a spreadsheet that Terramar provided. *See* JX 338. Cohen never asked for more details, because he did not need them. *See* Cohen Tr. 377–78.

### b. The Joint Purchase Requirement

The Trust next contends that Terramar breached the LLC Agreement and acted in bad faith by saying that it only would consider a joint offer by the Trust and Limited to purchase Terramar's member interest. Terramar did not commit a breach because it correctly understood what the LLC Agreement required.

Section 9.5 of the LLC Agreement states that "[a]t any time after January 1, 2006, [Terramar] shall have the right to give a notice . . . indicating to all other Members and to the Company that [Terramar] desires to have its interest purchased *by the other Members of the Company*." JX 3 § 9.5 (emphasis added). Under the provision's plain language, the Put Right calls for a purchase "by the other Members," not by either the Trust or Limited.

At post-trial argument, the Trust argued for the first time that "the use of the plural 'Members' in Section 9.5 cannot possibly be read to exclude the singular member" because of Section 12.9 of the LLC Agreement, which states that "[w]henever the context may require, . . . the singular form of nouns, pronouns and verbs shall include the plural and

32

vice versa." Dkt. 164 at 96 (citing JX 3 § 12.9). But the context of Section 9.5 does not require that the word "Members" include the singular. It requires the opposite.

The Put Right established a mechanism for the other members to buy out Terramar while retaining their relative positions vis-à-vis each other. Before the exercise of the Put Right, Terramar owned 50% of the member interest, and Limited and the Trust each owned 25%. After a joint purchase, Limited and the Trust would maintain their equal shares, with each owning 50%. If the Put Right permitted either Limited or the Trust to purchase Terramar's interest, then that member would have a 75% stake and achieve control. And how would Terramar decide which member got to buy its interest? The Put Right did not contemplate an auction; it contemplated a sale at the Terramar Purchase Price. And that price would be determined ultimately by three appraisers: one picked by Terramar, another picked by the minority members, and a joint appraiser. The appraisal mechanism did not contemplate the Trust and Limited picking separate appraisers; it contemplated them participating jointly in a purchase process (although in this case the Trust declined to participate). The plain meaning of the Put Right contemplated a joint purchase by Limited and the Trust so as to maintain the status quo between them.

Assuming for the sake of argument that the LLC Agreement allowed one minority member to accept the put unilaterally, then Terramar nevertheless was justified in insisting on a joint purchase. At the time, the Limited Action was still pending, and Limited had shown its willingness to litigate against Terramar. If Terramar had sold to the Trust, then Limited could have claimed that Terramar was breaching its fiduciary duties and the LLC Agreement by giving the Trust preferential treatment. *See, e.g.*, Zwieg Tr. 59–60, 66–67.

33

Terramar legitimately declined to take that risk.

In a related argument, the Trust contends that Terramar frustrated the Trust's efforts to purchase Terramar's member interest "by refusing to consider the Trust's expression of interest with Desert Troon, the Trust's capital source." Dkt. 159 at 53–54. As a threshold matter, Terramar had no obligation to accept a unilateral purchase by the Trust that excluded Limited.

Terramar was also justified in not considering a sale of assets to a third party, which Cohen appeared to be brokering. In the Trust's notice of dispute, Cohen suggested a sale to a third party and asked for confirmation that he could earn a brokerage fee. *See* JX 151 ("In the event that Mr. Cohen is successful in identifying a buyer, please confirm that Mr. Cohen's firm will receive the standard broker fee."). In its indication of interest dated February 9, 2016, Desert Troon sought to buy the Company's assets—the Seaport Lease and the Headquarters Lease—rather than Terramar's member interest.[16] By this time, the contractual appraisal process had begun, and Terramar correctly concluded that it could not sell the Company's assets until the dissolution phase.[17] After the Dissolution Right

---

[16] JX 179. In early February 2019, Cohen mentioned the possibility of the Trust and Desert Troon buying Terramar's member interest. PTO ¶ 27. When Cohen followed up to confirm his proposal, he clarified that Desert Troon and the Trust actually wanted to buy the Company's leases. JX 179.

[17] JX 182. *Compare* JX 3 § 5.6(b), (c), *with id.* § 9.5(d). *See* Zwieg Tr. 59–60 (explaining concern that Limited would challenge any decision to engage "in an off-market deal arrangement or marketing without permission to market property").

34

ripened in November 2016, Desert Troon did not make a bid. Six unrelated entities did. Terramar again acted properly.

### c. The Alleged Failure to Negotiate

Finally, the Trust argues generally that Terramar failed to negotiate with Cohen.[18] It takes two to tango: The obligation to negotiate in good faith applied to all members equally.

On balance, the predominant responsibility for any lack of negotiation rests with Cohen rather than with Terramar. As the Trust's expert conceded, Cohen could have responded to the Terramar Buy-Out Notice with a counteroffer. He never did. When Terramar sent the Trust an NDA, Cohen never responded. When the time came to select appraisers, the Trust disengaged. By contrast, Limited commented on the NDA and selected an appraiser. Limited also demanded more information about the Company's business. JX 162; JX 164.

Later, when Terramar reminded Limited and the Trust that the six-month period to buy its interest was about to expire, Limited challenged Terramar's computation of time. Evidencing its good faith, Terramar offered a five-month extension. *See* JX 202. The Trust

---

[18] Based on isolated quotations from a motion Terramar filed in the California Action, the Trust asserts that Terramar has taken "the unsupportable position that it was not obligated to negotiate with the Trust and refused to do so." Dkt. 159 at 49. A closer review of the motion reveals that Terramar argued that (i) the Company Fair Market Value was non-negotiable in the sense that it was an output generated by a contractual process, and (ii) Terramar was not obligated to negotiate with Desert Troon. *See id.*, Ex. C at 12–15. Both statements are accurate.

stayed out of the picture. When Terramar later suggested moving forward with a third-party process, Cohen refused to agree unless Terramar committed in advance to allocate a share of the proceeds to the Trust.

If anyone failed to negotiate in good faith, it was Cohen. The record also demonstrates that any negotiations over the Company Fair Market Value would not have succeeded. The price gap between the parties' positions was at least $12 million. Cohen never would have agreed to buy Terramar's member interest for an amount that he believed exceeded the value of the entire Company, and Terramar never would have accepted the substantial discount that Cohen admitted he was going to demand. *See* Cohen Tr. 365.

Terramar complied with Section 9.5 of the LLC Agreement when it exercised the Put Right and the Dissolution Right. Terramar is entitled to a declaration that it may dissolve the Company and unilaterally sell its assets to a third party.

## B. Disputes Over the Waterfall Amount

Section 4.1(c) of the LLC Agreement governs the waterfall distribution. Terramar's expert calculated that Terramar was owed $47,795,000 under the waterfall as of December 31, 2018. Taylor Tr. 479. The Trust does not dispute Terramar's calculation as a matter of accounting or math. Instead, the Trust contends that the court should adjust this figure downward because Terramar breached its contractual obligations and fiduciary duties while operating and financing the Company between 2003 and 2017. In light of the Settlement Agreement that became effective on October 2, 2015, the Trust's assertions fall into two groups: pre-effective-date conduct and post-effective-date conduct.

### 1.  Pre-Settlement Conduct

The Trust asserts that Terramar engaged in various misconduct before the Settlement Agreement became effective on October 2, 2015. Its principal allegations are as follows:

- Between 2003 and 2010, Terramar caused the Company to incur over $15 million in pre-development costs for Phase Two, even though the Company had not yet gained control of Old Police Headquarters. Most of the costs were excessive fees to Terramar. Instead of paying those fees, the Company should have paid down the Terramar Priority Return, which grew by 11.5% annually.

- In 2010 and 2012, Terramar made capital contributions and Member Loans to finance the Company's operations. Terramar's financing unfairly increased what it was owed under the waterfall. The Company should have used cheaper third-party financing instead.

- Terramar used an ineffective negotiating strategy with the Port. Instead of entering into the Headquarters Lease in 2012, it should have conditioned its acceptance of the Headquarters Lease on the Port extending the Seaport Lease. Before 2012, Terramar had failed for years to diligently pursue an extension.

Terramar contends that the Trust's pre-settlement challenges were released, are now time-barred, and have been waived based on how the Trust conducted itself in this litigation. In my view, the challenges were released and are time-barred, so this decision does not reach the question of waiver, which raises subtler issues involving how the case was pled and subsequently unfolded.

### a.  The Release

Terramar first argues that the Trust released any challenges based on pre-settlement conduct. In the Settlement Agreement, the Trust released the "Cohen Claims." Comprising sixteen categories of alleged misconduct, the Cohen Claims included claims based on the following assertions:

37

- "Terramar did not manage the [Company] properly";

- "Terramar managed the [Company] in a manner that was intended to benefit Terramar at the expense of [the Trust] and to the detriment of the [Company] as a whole";

- "Fees paid to Terramar, payments of interest to Terramar, [and] repayment of member loans or payments constituting equity returns to Terramar have all been improper";

- "Failing to use debt financing when refinancing existing debt and funding development"; and

- "Failing to take advantage of historic low rates available in the market through the period that Terramar instead made capital contributions."

JX 130 at '970–71. The Trust agrees that its pre-settlement challenges to the Waterfall Amount are Cohen Claims.

Although the Trust released the Cohen Claims in the Settlement Agreement, the Trust argues that it only released its ability to assert its claims offensively, not to raise them as affirmative defenses. The Settlement Agreement is a contract governed by California law. *Id.* ¶ 8. For "releases in civil actions," California law "imputes to a person an intention corresponding to the reasonable meaning of his words and acts." *Jefferson v. Cal. Dept. of Youth Auth.*, 48 P.3d 423, 427 (Cal. 2002) (internal quotation marks omitted). "[C]ontract principles apply when interpreting a release, and . . . normally the meaning of contract language, including a release, is a legal question, not a factual question."[19] "Generally,

---

[19] *Solis v. Kirkwood Resort Co.*, 114 Cal. Rptr. 2d 265, 269 (Cal. Ct. App. 2001); *see Hess v. Ford Motor Co.*, 41 P.3d 46, 54 (Cal. 2002) (describing interpretation of release as "a question of ordinary contract interpretation"); Cal. Civ. Code § 1636 ("A contract

California law dictates that a release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." *Nelson v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 1222, 1230 (C.D. Cal. 2007) (internal quotation marks omitted).

The release in the Settlement Agreement is broad and all encompassing. In it, the Trust and Terramar

> generally release[d] and forever discharge[d] each other from any and all manner of claims, actions or causes of action, in law or in equity, suits, debts, liens, damages, losses, costs, attorneys' fees or expenses, of any nature whatsoever, known or unknown, fixed or contingent, accrued or not yet accrued, including specifically, but not exclusively, and without limitation, those arising out of, in connection with, or in any way related to the Cohen Claims or Seaport Village through the date of this Agreement.

JX 130 ¶ 2.1. Although this language does not contain the word "defenses," it encompasses not only "claims," "actions," and "causes of action," but also "suits," "debts," "liens," "damages," "losses," and "costs."

In my view, the plain language of the Settlement Agreement prevents Cohen from using the Cohen Claims to shift value between Terramar and the Trust. By styling the Cohen Claims as defenses in this action, the Trust seeks to do precisely that. According to the Trust, its defenses operate to reduce Terramar's financial recovery following any sale of the Company's assets. As a result of the reduction, Terramar will receive less, and the Trust will receive more. Although its arguments are nominally titled defenses, the Trust is

---

must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

39

seeking to shift value from Terramar to the Trust by imposing losses on Terramar and generating additional money for the Trust. The release extinguished the Trust's right to seek to impose losses on Terramar and recover on its own behalf.

The broader context for the Settlement Agreement reinforces this interpretation. Terramar and the Trust executed the Settlement Agreement shortly after Limited had tried similar claims against Terramar in the Limited Action. The Settlement Agreement released all of the claims that Limited tried, but carved out the phantom-income claim that Limited dropped before trial. One month later, this court ruled against Limited on the claims that the Trust settled. The release bars the Trust from asserting its pre-settlement defenses.

### b. Timeliness

In addition to being released, the Trust's pre-settlement challenges are time-barred. The applicable limitations period is three years. *See* 10 *Del. C.* § 8106. The Trust filed its answer and affirmative defenses in this case on June 28, 2018, rendering untimely any disputes over conduct predating June 28, 2015.

The Trust asserts that claims "are not subject to statutes of limitations" when raised as affirmative defenses. Dkt. 159 at 25. That broad assertion is incorrect. Instead, a narrow exception to the limitations period exists that permits a defendant to use the defense of recoupment to resuscitate a time-barred claim and reduce the amount of damages that a plaintiff recovers. *See TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 860 (Del. Ch. 2004) (Strine, V.C.) ("To the extent that a valid recoupment claim is asserted defensively, it is not subject to statutes of limitations."); 80 C.J.S. *Set-off and Counterclaim* § 2, Westlaw (database updated Mar. 2019) ("Recoupment is a common-law, equitable doctrine

40

that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff." (footnote omitted)). A defendant cannot assert just any claim against the plaintiff as a defense; time-barred claims can only be asserted for recoupment "when they arise out of the same factually-related transaction as the plaintiff's claim." *Finger Lakes Capital P'rs, LLC v. Honeoye Lake Acq., LLC*, 151 A.3d 450, 453 (Del. 2016). The defendant also must show that "the recoupment claim seeks the same type of relief as is sought by the plaintiff" and that "the claim is purely a defensive set-off and does not seek an affirmative recovery from the plaintiff."[20] "Both the primary damages claim and a claim in recoupment must involve the same litigants." 80 C.J.S. *Set-off and Counterclaim* § 65 (Westlaw (database updated Mar. 2019). "Where the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment."[21]

The *TIFD III-X* decision is directly on point.[22] There, a limited partner exercised its

---

[20] 80 C.J.S. *Set-off and Counterclaim* § 36, Westlaw (database updated Mar. 2019); *accord TIFD III-X*, 883 A.2d at 859. *See generally Finger Lakes*, 151 A.3d at 453 (distinguishing recoupment from set-off).

[21] *Id.* § 36; *see id.* ("[O]ne contract alone is not sufficient to establish a 'single transaction,' for purposes of the requirement under the recoupment doctrine that countervailing demands of parties arise from the same transaction, since separate transactions may occur within the confines of the contract."); *TIFD III-X*, 883 A.2d at 864.

[22] At post-trial argument, the Trust argued that Terramar waived its limitations argument and could not rely on *TIFD III-X* by not briefing these issues before its post-trial reply brief. Dkt. 164 at 74–75. "The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d

right to dissolve a partnership and sought a declaratory judgment against the general partner establishing how the contractual waterfall operated. The general partner contended that the limited partner reduced the partnership's profits by breaching the partnership agreement many years ago. The general partner sought a remedy adjusting the distribution calculation to increase its share of the payout. Chief Justice Strine, then a Vice Chancellor, held that the historical claims of breach were time-barred and rejected the general partner's attempt to raise them as a recoupment defense. He reasoned that the time-barred challenges asserted breaches of provisions other than the distribution provision, foreclosing recoupment.[23] He also explained that the policies underlying statutes of limitation called for foreclosing the

---

482, 502 n.77 (Del. 2019). Despite the general practice, "[t]he determination of whether *vel non* an argument is waived is highly contextual and ultimately a matter within this Court's discretion . . . ." *REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*, 2018 WL 1109650, at *4 (Del. Ch. Feb. 28, 2018); *accord Cent. Mortg. Co v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 2012 WL 3201139, at *14 n.112 (Del. Ch. Aug. 7, 2012) (Strine, C.) ("Although, as a general matter, arguments not briefed are deemed waived, this is a principle of discretion . . . ."). Terramar raised the statute of limitations issue in its pre-trial brief and identified it in the pre-trial order. While it is true that Terramar's post-trial opening brief made only a passing reference to it, the Trust's answering brief responded and cited authorities for the proposition that a statute of limitations does not apply to affirmative defenses. Terramar properly used its reply brief to reply to this argument. The Trust and Terramar both engaged on the issue during post-trial argument.

[23] *See TIFD III-X*, 883 A.2d at 863–64 ("To the extent that [the limited partner's] claims arise out of any 'transaction' at all, that transaction was the dispute between the parties regarding the interpretation of [the distribution provision] and the ensuing decision by [the limited partner] to dissolve the Partnership, a 'transaction' to which [the limited partner's] alleged past breaches of the Partnership Agreement are unrelated.").

general partner's effort to resuscitate its claims.[24]

In this case, the Trust cannot resuscitate its time-barred challenges as a recoupment defense because the time-barred challenges do not arise out of the same transaction as the claims that Terramar has asserted under Section 9.5 of the LLC Agreement. Terramar's claims relate to Terramar's exercise of the Put Right and Dissolution Right. The Trust's challenges relate to historical events involving alleged breaches of other provisions of the LLC Agreement. *See* Dkt. 159 at 8–9 (asserting breaches of Sections 2.6, 3.2, 4.1, 5.4, 5.6, and 5.10 of the LLC Agreement). The Trust's challenges are time-barred.[25]

---

[24] *See id.* at 865 ("[I]t makes little sense as a matter of policy to interpret the transactional nexus requirement so broadly as to permit a party to sit on its contractual rights and wait until dissolution to assert its claims. By that time, much of the evidence pertinent to those claims, such as testimony of employees involved in the relevant events who have long-since left the enterprise, might be unavailable or less reliable, and the plaintiff might be unable to mount a successful defense. Moreover, when a significant amount of time passes after a dispute arises and no claim is ever filed against a party, that party tends to assume that the dispute has been laid to rest.").

[25] The parties litigated as if the limitations bar applied to disputes arising more than three years before the Trust filed its answer. Although no one raised it, another possibility is that the limitations bar applies to disputes arising more than three years before Terramar filed its complaint. *See* 10 *Del. C.* § 8120 ("This chapter shall apply to any debt alleged by way of setoff or counterclaim on the part of a defendant. The time of limitation of such debt shall be computed in like manner as if an action therefor had been commenced at the time when the plaintiff's action commenced."). The extended limitations period would apply if the Trust had asserted its defenses as a set-off. "Set-off is a mode of defense by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part." *Finger Lakes*, 151 A.3d at 453 (quoting 1 Victor B. Wooley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware* § 492 (1906)). *But see* 80 C.J.S. *Set-off and Counterclaim* § 3, Westlaw (database updated Mar. 2019) ("[Set-off] is the right which exists between two parties, each of whom under an independent contract owes an ascertained amount to the other, to set-off their respective debts by way of mutual

43

## 2. Post-Settlement Conduct

The Trust contends that after the effective date of the Settlement Agreement, Terramar acted improperly by (i) abandoning its efforts to extend the Seaport Lease, (ii) sabotaging negotiations with NorthStar, and (iii) collecting unauthorized fees from the Company.

In the factual background section of its post-trial answering brief, the Trust argues that Terramar should have acted differently in October 2015 when the Port declined to extend the Seaport Lease. According to the Trust, Terramar should at least have sought a short-term lease extension. The record convinces me that the Port would not have reconsidered its decision. *See, e.g.*, JX 12 at 9 (Port policy allowing lease extension where a proposal is "consistent with the [Port's] vision for the future use of the property" and meets additional criteria). The Port had just determined that Seaport Village's continued operation was inconsistent with the Port's development goals. Before the Port's decision became final, Terramar submitted a rebuttal. The Port was unconvinced.

The Trust also asserts that Terramar sabotaged the opportunity for a loan from NorthStar that would have freed up "as much as $8 million" to pay towards the Terramar Priority Return. *See* Cohen Tr. 272. The record shows that the discussions with NorthStar

---

deduction, so that in any action brought for the larger debt the residue only, after deduction, may be recovered. . . . It is a claim for affirmative relief, rather than a defense."). At post-trial argument, the Trust indicated that it does not seek a set-off, rendering this issue moot. *See* Dkt. 164 at 78 ("There's never been any claim for recoupment or setoff asserted by the Trust.").

fell apart when the Port refused to approve changes to the Headquarters Lease that NorthStar wanted. Terramar tried to convince the Port, but the Port would not budge. *E.g.*, JX 184; JX 187.

The Trust finally asserts that Terramar breached an unspecified provision of the LLC Agreement by collecting excessive compensation from the Company without contractual authorization. Most of the amounts pre-dated the Settlement Agreement, so those challenges were released and are time-barred.

In making this argument, the Trust appears to be focusing on Section 5.4 of the LLC Agreement, which required the Company to engage Terramar for leasing, property management, accounting, construction, development, financing, contracting, and design services. *See* JX 3 § 5.4(d). Section 5.4 specified that any contracts for these services could only involve a "Market Fee," defined elsewhere in the LLC Agreement as "the payment that a Person would receive for the performance of particular services in California as reasonably determined by [Terramar]." *Id.* § 1.36. Citing the Company's audited financials, the Trust notes that Terramar received $2,026,620 in leasing commissions between 2003 and 2017, including $71,260 in 2017. *E.g.*, JX 302 at 13. The Trust objects that the audited financials "do not explain whether [Terramar's] commissions reflected market rates, were paid pursuant to the required contracts, or why Terramar was paid leasing commissions when the Company engaged [a third-party] leasing agent." Dkt. 159 at 43. Absent some initial reason to question these charges, Terramar was not obligated to parse the Company's audited financial statements and introduce evidence at trial to support these items to the Trust's satisfaction. The Trust's objections to these amounts reflect conclusory speculation.

45

### 3. The Finding Regarding the Waterfall Amount

The Trust's assertions about Terramar's conduct do not warrant an adjustment to the Waterfall Amount. Terramar is entitled to a declaration that it has correctly calculated the allocation of the proceeds from the sale of the Company's assets after a dissolution.

## C. Remaining Defenses

Finally, the Trust recasts its general complaints about Terramar's conduct under the affirmative defenses of unclean hands and equitable estoppel. The Trust also asserts that Terramar breached the implied covenant of good faith and fair dealing by exercising the Dissolution Right without the consent of the other members. Through these defenses, the Trust seeks to nullify Terramar's entitlement to declaratory relief and obtain a do-over.

First, the Trust contends that even if Terramar is entitled to declaratory relief under the LLC Agreement, its claims should be barred under the doctrines of unclean hands and equitable estoppel. For support, the Trust asserts that Terramar has engaged in a pattern of wrongdoing throughout the Company's existence. In other words, the equitable defenses repackage the arguments that this decision has rejected.[26] These equitable defenses fail for

---

[26] The Trust asserts two examples of inequitable conduct that were not resolved above. First, the Trust contends that Terramar acted wrongfully by allocating phantom income to the Trust. The Trust has not explained this argument in a level of detail sufficient for the court to consider it. The Settlement Agreement discusses the phantom-income claim, which arises from Terramar's allocation of income to the Trust for the 2012 tax year. The phantom-income defense is therefore time-barred.

Second, the Trust asserts that Terramar induced the Trust to enter into the Settlement Agreement in October 2015 because it did not inform the Trust that the Port would soon decline to extend the Seaport Lease. As discussed in the Factual Background, the Trust

the same reason that the underlying arguments fail. Because the Trust's assertions did not justify lowering the Waterfall Amount, it follows that the same assertions do not justify cutting off Terramar's relief completely.

The Trust also invokes the implied covenant of good faith and fair dealing. The Trust points out that Section 5.6 of the LLC Agreement requires 75% of the member interest to consent to a dissolution of the Company or a "sale or disposition of all or any substantial portion" of its assets. JX 3 § 5.6(b), (c). The Trust believes that it violates the implied covenant for Terramar to rely on the Dissolution Right instead of seeking minority member consent under Section 5.6.

Invoking the implied covenant "is a 'cautious enterprise' that 'is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.'" *Oxbow*, 202 A.3d at 507 (footnote omitted). "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been

---

excluded this argument from its answer, contending that it should be heard in the California Action instead. Three months before trial, the Trust moved for leave to assert its challenge to the Settlement Agreement as part of a counterclaim. Leave was denied. That determination is the law of the case. *See Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del. 1983) ("[T]he doctrine of the law of the case normally requires that matters previously ruled upon by the same court be put to rest."); *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."). Finally, the release did not become effective until Terramar paid the settlement consideration on January 4, 2016. JX 130 ¶¶ 1, 2.1; JX 150. By that point, the Trust knew the Seaport Lease had not been extended, but it accepted the settlement funds anyway. Cohen Dep. 89.

anticipated, but were not, that later adversely affected one party to a contract." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); *see Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032–33 (Del. Ch. 2006) (Strine, V.C.) ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."). "The implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec*, 991 A.2d at 1127; *accord Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("[T]he implied covenant cannot be invoked to override express provisions of a contract.").

The Put Right and Dissolution Right have independent legal significance. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985) (citing "the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); *see also* 6 *Del. C.* § 18-1101(h). If Terramar could satisfy the requirements of those provisions, then Terramar was entitled to invoke them without violating Section 5.6.

## D. Fee-Shifting

Section 12.12 of the LLC Agreement provides:

> If any action is brought by any party against another party, relating to or arising out of this Agreement, or the enforcement hereof, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action. . . .

As the prevailing party, Terramar is entitled to recover its expenses from the Trust. The

term "expenses" refers collectively both to attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. *See Meyers v. Quiz-DIA LLC*, 2018 WL 1363307, at *1 n.3 (Del. Ch. Mar. 16, 2018).

### III.    CONCLUSION

Terramar and the Trust shall confer regarding the amount of Terramar's expense award. If the parties cannot agree on an amount, then Terramar shall file a motion supported by a Rule 88 affidavit. If there are other outstanding issues that the court needs to address before a final order can be entered, then the parties shall submit a joint letter within fourteen days that identifies them and proposes a path to bring this case to a conclusion at the trial level. Otherwise, the parties shall submit a form of order implementing the rulings in this decision.